In re VMS SECURITIES LITIGATION.

No. 89 C 9448.

United States District Court,
N.D. Illinois, E.D.

Oct. 19, 1990.

On Motion for Reconsideration
Oct. 31, 1990.

Albert and Ilene D. Albert (89 C 9448), H. Budd Mittleman (90 C 0179), Joseph G. and Mary T. Iantuono (90 C 0460), Judith Ludwig (90 C 0461).

David J. Bershad, Robert A. Wallner, Milberg, Weiss, Bershad, Specthrie & Lerach, New York City, for David Albert and Ilene D. Albert (89 C 9448), H. Budd Mittleman (90 C 0179).

Robert W. Mills, Law Offices of Robert W. Mills, San Rafael, Cal., for David Albert and Ilene D. Albert (89 C 9448).

Mark C. Gardy, Abbey & Ellis, Curtis V. Trinko, Law Offices of Curtis V. Trinko, New York City, Richard S. Schiffrin, Schiffrin & Craig, Chicago, Ill., for Mary A. Marangos (90 C 0426).

Robert S. Atkins, Robert Williams, Robert S. Atkins & Associates, Chicago, Ill., Kenneth G. Gilman, David Pastor, Gilman and Pastor, Revere Beach, Mass., for Lavinia Holzhaur (90 C 0396).

Robert S. Atkins, Robert Williams, Robert S. Atkins & Associates, Chicago, Ill., Robert L. Leiff, Elizabeth Joan Cabraser, William B. Hirsch, Marilyn Kaplan, Leiff, Cabraser & Heimann, San Francisco, Cal., for Margot B. Duxler (90 C 0445).

Sherrie Savett, Berger & Montague, Philadelphia, Pa., Richard S. Schiffrin, Schiffrin & Craig, Chicago, Ill., for Edward McDaid (90 C 0369).

Michael J. Freed, Joseph D. Ament, Michael B. Hyman, Much Shelist Freed Denenberg Ament & Eiger, Chicago, Ill., Bruce E. Gerstein, Bertram Bronzaft, Garwin Bronzaft Gerstein & Fisher, New York City, for Jeffrey Alexander (90 C 0459).

Ronald L. Futterman, Hartunian Futterman & Howard, Chicago, Ill., Robert W. Kirby, Lubna M. Faruqi, Kaufman Malchman Kaufman & Kirby, New York City, for Sol Klughaupt (90 C 0576).

Lawrence Walner, Lawrence Walner & Associates, Chicago, Ill., for Walter D. Ford, Sr. (90 C 0278).

Arthur T. Susman, Terry Rose Saunders, Susman, Saunders & Buehler, Stephen C. Shamberg, Stackler & Shamberg, Donald Statland, Chicago, Ill., Stephen Lowey,

---

David J. Bershad, Robert A. Wallner, Milberg, Weiss, Bershad, Specthrie & Lerach, Lead Counsel, New York City, Marvin A. Miller, Patrick E. Cafferty, Chertow & Miller, Liaison Counsel, Chicago, Ill., for plaintiffs.

Marvin A. Miller, Patrick E. Cafferty, Chertow & Miller, Chicago, Ill., for David

Richard C. Fooshee, Lowey, Dannenberg, Bemporad, Brachtl & Selinger, P.C., New York City, for Paul J. Isaac and David E. Robbins (90 C 0904), George Barcik, Norman Berman, Cook Bros. Money Purchase Pension Trust and Cook Bros. Profit Sharing and Retirement Trust (90 C 1074).

Stephen B. Diamond, Beeler, Schad & Diamond, Chicago, Ill., for Alan L. Hess (90 C 0952).

Robert D. Allison, Law Offices of Robert D. Allison, Chicago, Ill., for John E. Holcomb (90 C 1200).

Marvin A. Miller, Patrick E. Cafferty, Chertow & Miller, Chicago, Ill., David B. Zlotnick, Zlotnick & Thomas, Bala Cynwyd, Pa., for Quaker Valley Meats (90 C 1358).

Marvin A. Miller, Patrick E. Cafferty, Chertow & Miller, Chicago, Ill., Stuart D. Wechsler, Wechsler Skirnick Harwood Halebian & Feffer, New York City, for Stewart J. Eisenberg (90 C 1428).

Marvin A. Miller, Patrick E. Cafferty, Chertow & Miller, Chicago, Ill., David J. Bershad, Robert A. Wallner, Milberg Weiss Bershad Specthrie & Lerach, New York City, for Lewis D. Rubin (90 C 1496).

Marvin A. Miller, Patrick E. Cafferty, Chertow & Miller, Chicago, Ill., Michael S. Glassman, Kathleen L. Clemens, Clemens, Glassman and Clemens, Los Angeles, Cal., for John A Falco and Ilana M. Falco (90 C 1535).

Marvin A. Miller, Patrick E. Cafferty, Chertow & Miller, Chicago, Ill., Glen DeValerio, Margaret G. Dobies, Melissa M. Thomson, Berman, DeValerio & Pease, Boston, Mass., Stanley Grossman, Pomerantz, Levy, Haudek, Block & Grossman, New York City, for Holly Paramenter and Ruth Anne Dykeman (90 C 1560).

Robert M. Roseman, Mark S. Goldman, Rudolph, Seidner, Goldstein, Rochestie & Salmon, P.C., Eugene A. Spector, John F. Innelli, Eugene A. Spector & Associates, Philadelphia, Pa., for Marie Matson (90 C 1621).

Marvin A. Miller, Patrick E. Cafferty, Chertow & Miller, Chicago, Ill., Klari Neuwelt, Wolf Popper Ross Wolf & Jones, New York City, for Barbara Tepperman (90 C 1639).

Barry B. Gross, Joel Sprayregen, Nicholas H. Diacou, Clifford E. Yunkis, Shefsky & Froehlich, Ltd., Chicago, Ill., for VMS Mortg. Inv. Fund.

Matthew Gluck, Jane Wasman, Fried, Frank, Harris, Shriver & Jacobson, New York City, for VMS Realty Investors.

Timothy A. Nelson, Donna L. McDevitt, Skadden, Arps, Slate, Meagher & Flom, Chicago, Ill., for Prudential–Bache Properties, Inc., Prudential–Bache Securities, Inc.

Byron L. Gregory, Steven Hoeft, William P. Schuman, McDermott, Will & Emery, Chicago, Ill., Joseph P. Cyr, Morgan, Lewis & Bockius, New York City, Alfred H. Hoddinott, Jr., Asst. General Counsel, Litigation, Xerox Corp., Stamford, Conn., for XCC Inv. Corp., Xerox Corp., Xerox Credit Corp., Melvin Howard.

Allan T. Slagel, Phelan Pope & John, Ltd., Chicago, Ill., for Walter Auch, Sr., David Blalock, Sr., Phillip Brady, Norman Gold, Gerald Nudo, Marvin Sotoloff, Robert Ungerleider, James Wisner.

Sarah R. Wolff, Lowell Sachnoff, Joel M. Neuman, Sachnoff & Weaver, Ltd., Chicago, Ill., for Peter Morris, Joel Stone.

Frank A. Karaba, Charles W. Siragusa and Wade R. Joyner, Crowley, Barrett & Karaba, Chicago, Ill., for Robert D. Van Kampen and Brewster Realty, Inc.

## MEMORANDUM OPINION AND ORDER

CONLON, District Judge.

This consolidated class action and shareholder derivative suit was brought on behalf of disappointed investors in one or more of five real estate investment trusts and three real estate limited partnerships (collectively, "the Funds"). The Funds were allegedly sponsored by VMS Realty Partners, one of the defendants. The plaintiff class consists of all persons who purchased securities of the Funds during the period from the first public issuance of any securities of the Funds to February 13,

1990 ("the class period").[1] The consolidated complaint breaks the class down into eight subclasses. Each subclass is comprised of investors of a particular Fund. The subclass members sue on behalf of themselves as purchasers of a Fund's securities, and also derivatively, on behalf of the particular Fund. The forty-nine defendants named in the complaint are:

(a) the eight Funds:
 (1) VMS Mortgage Investment Fund;
 (2) VMS Hotel Investment Fund;
 (3) VMS Short Term Income Trust;
 (4) VMS Strategic Land Trust;
 (5) VMS Strategic Land Fund II;
 (6) VMS Mortgage Investors L.P.;
 (7) VMS Mortgage Investors L.P. II;
 (8) VMS Mortgage Investors L.P. III;

(b) VMS Realty Partners, the alleged sponsor of the Funds and creator of a vast real estate empire;

(c) the four general partners of VMS Realty Partners:
 (1) Brewster Realty, Inc. ("Brewster");
 (2) Residential Equities, Ltd. ("Residential Equities");
 (3) Van Kampen/Morris/Stone, Inc. ("V/M/S");
 (4) XCC Investment Corporation ("XCC");

(d) The members of the VMS Realty Partners executive committee:
 (1) Robert D. Van Kampen (alleged co-owner of V/M/S and Brewster);
 (2) Peter R. Morris (alleged co-owner of V/M/S and Residential Equities);
 (3) Joel A. Stone (alleged co-owner of V/M/S and Brewster);
 (4) Melvin Howard (officer and director of Xerox Corporation and Xerox Credit Corporation);

(e) real estate appraisers who allegedly issued opinion letters for the Funds' investments:
 (1) Marshall & Stevens, Incorporated ("Marshall & Stevens");
 (2) Joseph J. Blake & Associates ("Blake");

(f) companies who allegedly acted as guarantor of the Funds:
 (1) VMS Mortgage Investors II, Inc.;
 (2) VMS Mortgage Investors III, Inc.;
 (3) VMS Financial Guarantee, L.P.;
 (4) VMS Mortgage Company;
 (5) VMS Mortgage Company II;

(g) underwriters and selling agents for the Funds:
 (1) VMS Securities, Inc.;
 (2) Prudential–Bache Securities;

(h) certain alleged advisors and "controlling persons" of the Funds:
 (1) Prudential–Bache Properties;
 (2) VMS Realty, Inc.;
 (3) VMS Realty Investors;

(i) general partners of the Funds, including:
 (1) VMS Mortgage Investors, Inc.;
 (2) VMS Financial Services;

(j) Officers, directors, trustees, and/or alleged "controlling persons" of the Funds, including, but not limited to, the following:
 (1) Albert Kopin;
 (2) Scott Lager;
 (3) Walter Auch, Sr.;
 (4) Robert Ungerleider;
 (5) Leonard Levine;
 (6) Norman Gold;
 (7) Marvin Sotoloff;
 (8) Gerald Nudo;
 (9) James Wisner;
 (10) David Blalock, Sr.;
 (11) Philip Brady;
 (12) Robert Wislow;
 (13) Gary A. Rosenberg;[2]
 (14) William Sales;
 (15) Xerox Credit Corporation;
 (16) Xerox Financial Services;
 (17) Xerox Corporation;

(k) Jeffrey J. Park, alleged former officer of VMS Realty Partners and Xerox Financial Services.

---

1. The plaintiff class has not yet been certified. Briefing on plaintiffs' motion for class certification has been stayed on the court's own motion.

2. On October 11, 1990, while this motion to dismiss was pending, plaintiffs voluntarily dismissed without prejudice defendants Gary A. Rosenberg and Robert Wislow.

The forty-count complaint charges the defendants with violations of the federal securities laws and the Racketeer Influenced and Corrupt Organizations Act ("RICO"). In addition, plaintiffs allege pendent state claims of common law fraud, negligent misrepresentation, breach of contract, and derivative claims of breach of fiduciary duty, waste, mismanagement, and breach of contract.

Defendants filed a joint motion to dismiss the consolidated complaint under Fed. R.Civ.P. 9(b) and 12(b)(6). Defendants also assert that the suit is barred by the statute of limitations.

## BACKGROUND

■ In deciding a motion to dismiss, the court must accept as true all the well-pleaded factual allegations and inferences reasonably drawn from them. *Gomez v. Illinois Bd. of Educ.*, 811 F.2d 1030, 1039 (7th Cir.1987). Dismissal is proper if it appears beyond doubt that the plaintiffs could prove no set of facts in support of their claims that would entitle them to the relief requested. *Illinois Health Care Assoc. v. Illinois Dep't of Public Health*, 879 F.2d 286, 288 (7th Cir.1989), citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957).

### A. VMS Realty Partners

Defendant VMS Realty Partners is an Illinois general partnership engaged in real estate investment and development. Consolidated Complaint ("Complaint") ¶¶ 6, 13(i). Since 1979, VMS Realty Partners and its affiliates have sponsored approximately 115 real estate investment programs, raising more than $2.5 billion from more than 110,000 investors. Complaint ¶ 25. These programs include the Funds, which make mortgage loans to affiliated entities. *Id.* VMS Realty Partners is comprised of four corporate general partners: (1) defendant V/M/S, owned by defendants Van Kampen, Morris, and Stone; (2) defen-

dant Brewster, owned by Van Kampen and Stone; (3) defendant Residential Equities, owned by Morris; and (4) defendant XCC, an indirect subsidiary of defendant Xerox Corporation.[3] Complaint ¶¶ 13(h, j, k, l, qq, rr, ss). Van Kampen, Morris, and Stone serve on the four-member executive committee of VMS Realty Partners, along with defendant Melvin Howard, who was nominated to the executive committee by Xerox Corporation. Complaint ¶¶ 13(j, k, l, m).

### B. The Funds

Between November 14, 1984 and October 31, 1988, VMS Realty Partners created and sponsored the eight Funds that are the subject of this litigation. Complaint ¶¶ 6, 13(a-h). Each Fund purported to have a distinct primary purpose. Complaint ¶ 26.

*VMS Short Term Income Trust ("Income Trust")*

The Income Trust is a real estate investment trust that made interim short-term loans primarily to affiliates of VMS Realty Partners. Complaint ¶¶ 26, 90. The affiliated borrowers used the loans to purchase income-producing properties and to finance other costs associated with these properties until the borrowers could find other investors to finance the properties. Complaint ¶ 90. The Income Trust's loans were secured by the income-producing properties. *Id.* Between November 14, 1984 and December 26, 1984, the Income Trust sold its shares through an initial public offering in the principal amount of approximately $69 million, at $10 per share. Complaint ¶ 13(a).

Four purchasers of Income Trust securities represent the plaintiff subclass of Income Trust investors: Lewis D. Rubin; Patrick Reed; Cook Brothers Profit Sharing and Retirement Trust ("Cook Bros. PSR"); and Cook Brothers Money Purchase Pension Trust ("Cook Bros. MPP"). Complaint ¶ 18(b). The complaint does not allege the dates of purchase for the subclass plaintiffs.

---

**3.** XCC acquired its 25% interest in VMS Realty Partners in February 1987 for $70 million. Complaint ¶ 13(y). V/M/S has been a general partner since 1986. Complaint ¶ 13(qq). Resi-

dential Equities and Brewster have been general partners throughout the class period. Complaint ¶¶ 13(rr, ss).

*VMS Mortgage Investors, L.P. ("MILP I")*

MILP I was one of three limited partnerships formed to make mortgage loans to affiliated and non-affiliated entities. Complaint ¶ 26. The loans carried terms of three, five or seven years, and were secured by various types of improved real estate. *Id.* Between March 1, 1985 and August 7, 1985, MILP I raised approximately $75 million at $10 per unit during its initial public offering. Complaint ¶ 13(b). The following plaintiffs purchased units of MILP I and represent the MILP I subclass: Cook Bros. PSR; Cook Bros. MPP; Edward McDaid; Barbara Tepperman. Complaint ¶ 18(c). The complaint fails to allege these plaintiffs' dates of purchase.

*VMS Hotel Investment Fund ("Hotel Fund")*

The Hotel Fund was formed as a real estate investment trust for the purpose of making mortgage loans secured by hotel and resort properties owned or acquired by affiliates of VMS Realty Partners. Complaint ¶¶ 26, 173. Between July 12, 1985 and January 6, 1986, the Hotel Fund made its initial public offering and raised approximately $98 million at $20 per unit, each unit consisting of two shares of common stock and one warrant. Complaint ¶ 13(c). Eight plaintiffs sue on behalf of the subclass of investors in the Hotel Fund. Complaint ¶ 18(f). Two plaintiffs, Marie Matson and David E. Robbins, purchased their Hotel Fund units during the initial public offering. Complaint ¶¶ 12(v, bb). The complaint does not specify when the remaining representatives of the Hotel Fund subclass purchased their units.[4]

*VMS Mortgage Investors L.P. II ("MILP II")*

MILP II is the second limited partnership in the VMS Mortgage Investors series. Complaint ¶ 26. As with MILP I, this limited partnership made mortgage loans with terms of three, five or seven years to affil-

iated and non-affiliated entities. *Id.* The loans were secured by various types of improved real estate. *Id.* MILP II commenced its initial public offering on January 2, 1986. Complaint ¶ 13(d). At the close of the initial public offering, July 3, 1986, MILP II had raised approximately $124 million at $10 per unit. *Id.* Plaintiffs Ilana and John Falco and Atlantic Electric Supply Corporation Pension Plan ("Atlantic Electric") purchased units of MILP II during the initial public offering. Complaint ¶¶ 12(c, k, l). These plaintiffs represent the MILP II subclass. Complaint ¶ 18(d).[5]

*VMS Strategic Land Trust (the "Land Trust")*

The Land Trust was formed as a real estate investment trust with the purpose of making short term junior mortgage loans to affiliated borrowers. Complaint ¶ 26. These affiliated borrowers sought to acquire and develop "strategically located properties not at their highest and best use." *Id.* The initial public offering, held between September 9, 1986 and December 31, 1986, sold shares for a total of $119 million at $10 per share. Complaint ¶ 13(e). Plaintiff Alan H. Hess represents the subclass of Land Trust investors. Complaint ¶ 18(g). The complaint does not state the date Hess purchased his shares.

*VMS Mortgage Investors L.P. III ("MILP III")*

MILP III, the third limited partnership in the VMS Mortgage Investors series, was formed to make junior mortgage loans, wraparound mortgage loans and first mortgage loans on income-producing properties owned or acquired by affiliates of VMS Realty Partners. Complaint ¶ 152. Between December 10, 1986 and June 30, 1987, MILP III offered and sold its units through an initial public offering in the amount of approximately $110 million at $10 per unit. Complaint ¶ 13(f). Plaintiffs John A. Falco and Joseph G. Iantuono Prof-

---

**4.** Those plaintiffs are: Walter D. Ford, Sr.; John E. Holcomb; Paul J. Isaac, Trustee under the will of Irving H. Isaac; Mary A. Marganos; Bertrand C. Sellier; and Quaker Valley Meats, Inc. Pension Plan UDT 11/1/83, Norman Fleekop, Trustee. Complaint ¶ 18(f).

**5.** Plaintiff Judith Ludwig also invested in MILP II, but the complaint does not allege the date she purchased her units.

it Sharing Plan and Trust, Joseph G. Iantuono, Trustee ("Iantuono"), purchased MILP III units during the initial public offering. Complaint ¶¶ 12(*l*, r). These two plaintiffs sue on behalf of the subclass of MILP III investors. Complaint ¶ 18(e).

*VMS Strategic Land Fund II ("Land Fund II")*

Land fund II was formed with the same purpose as the Land Trust, and made loans similar in type to those of the Land Trust. Complaint ¶ 26. Land Fund II initially offered its shares to the public between August 25, 1987 and January 31, 1988. Complaint ¶ 13(g). The following four plaintiffs purchased shares of Land Fund II during the initial public offering: John and Ilana Falco; George Barcik; and Margot Duxler. Complaint ¶¶ 12(d, h, k, *l*). These plaintiffs sue defendants on behalf of the subclass of Land Fund II investors. Complaint ¶ 18(h).

*VMS Mortgage Investment Fund ("MIF")*

MIF was a corporation formed with the intent of qualifying as a real estate investment trust. Complaint ¶ 26. MIF purported to invest primarily in short term loans, junior mortgage loans, wraparound mortgage loans and first mortgage loans on income-producing properties owned or acquired by affiliated borrowers. *Id.* MIF also invested in construction loans, pre-development loans and land loans on such properties. *Id.* The initial public offering raised approximately $395 million at $10 per share. Complaint ¶ 13(h). Nine plaintiffs purchased shares of MIF during the initial public offering, from March 30, 1988 to October 31, 1988. Complaint ¶¶ 12(a, e, i, p, s, v, x, ee). These plaintiffs, David and Ilene Albert, Norman Berman, Ruth Ann Dykeman, Lavinia Holzhauser, Sol Klughaupt, Marie Matson, M. Budd Mittleman and Stanley Schwarz, represent the subclass of MIF investors. Complaint ¶ 18(a). The complaint alleges three other plaintiffs, Jeffrey Alexander, Holly Parmenter and Stewart Eisenberg, as representatives of the MIF subclass, but these plaintiffs have not alleged the dates they purchased MIF securities. *Id.*

C. Allegations Concerning the Funds

Plaintiffs, in no less than forty counts, bring charges against each Fund and the defendants associated therewith. Although each count shall be treated separately on this motion, a description of the general nature of the allegations is instructive.

In essence, the plaintiffs claim that the Funds suffered from gross mismanagement and that the defendants committed securities fraud by misstating the nature of the Funds' business operations and financial condition. Complaint ¶¶ 15, 28. The defendants allegedly managed the Funds for the benefit of VMS Realty, its principals and affiliates, and to the detriment of the Funds. Complaint ¶¶ 15, 28. For example, the Funds made loans to affiliates of VMS Realty Partners that were allegedly secured by overleveraged properties with inflated appraisal values. Complaint ¶ 30. According to plaintiffs, the Funds issued misleading financial documents failing to apprise investors that overleveraged properties secured the Funds' loans. *Id.* Plaintiffs claim that VMS Realty Partners routinely advanced money to the Funds' borrowers to enable those borrowers to meet their loan obligations to the Funds. Complaint ¶ 31. The foregoing practices were allegedly concealed from investors until November 14, 1989, when each Fund announced in its third quarter 10–Q report that VMS Realty would no longer advance money to the Funds' borrowers. Complaint ¶¶ 31, 40, 47. The market price of the Funds' shares and units dropped sharply in the wake of this news. Complaint ¶ 48. Plaintiffs assert that, given these undisclosed practices, the Funds' projected yields at the initial public offering were unrealistically high, and that the prices of the securities were therefore materially inflated. Complaint ¶¶ 15, 30. Plaintiffs also claim that, given these undisclosed practices, the Funds' financial statements during the class period were materially misleading because they failed to include adequate reserves for losses on loans and receivables. Complaint ¶ 33. Plaintiffs further maintain that defendants falsely

represented the Funds as conservative investments. Complaint ¶ 36.

Plaintiffs additionally assert that in order to conceal pervasive liquidity problems confronting VMS Realty Partners and its affiliates, VMS Realty Partners used the Funds to engage in loan churning. Complaint ¶ 40. The alleged loan churning scheme required a Fund to make a loan to a limited partnership to enable it to pay off earlier advances from VMS Realty Partners or to retire outstanding loans coming due to another Fund. *Id.* The Funds also engaged in a variation of loan churning, whereby the Funds would sell or purchase their loans to or from each other. Complaint ¶ 40(e). As an additional example of defendants' mismanagement of the Funds, plaintiffs cite the "extraordinarily high" fees that VMS Realty Partners reaped from the Funds and the Funds' borrowers. Complaint ¶¶ 38, 45.

### D. Procedural History

On December 22, 1989, plaintiffs David and Ilene Albert filed a class action on behalf of all investors in MIF against some, but not all, defendants in the present case. Over eleven other class actions suits were subsequently initiated. The first class action to sue all the Funds on behalf of investors in all the Funds was filed on January 11, 1990, and named twenty-seven defendants. On April 30, 1990, all pending cases were consolidated into this single class action on behalf of investors in all eight Funds against the forty-nine defendants.

Plaintiffs filed their consolidated class action complaint on April 30, 1990. Plaintiffs bring counts one through nine under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5. Counts ten and eleven allege violations of §§ 11 and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k and 77*o*. Counts twelve through fourteen are brought pursuant to §§ 12(2) and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77*l*(2) and 77*o*. Of the state law claims, counts fifteen through twenty-two allege common law fraud, counts twenty-three through thirty are for negligent misrepresentation, and counts thirty-one through thirty-eight state derivative claims for breach of fiduciary duty, waste, mismanagement and breach of contract. Plaintiffs bring count thirty-nine on behalf of MIF against VMS Financial Guarantee, L.P. for breach of contract. Count forty alleges violations of RICO, 18 U.S.C. § 1962(a), (b) and (c).

Defendants move to dismiss all counts on three grounds: (1) the statute of limitations has run on all claims; (2) plaintiffs have failed to plead allegations of fraud with particularity as required by Fed.R.Civ.P. 9(b); and (3) the complaint fails to state a claim for which relief may be granted. Fed.R.Civ.P. 12(b)(6).

## DISCUSSION

### I. The Statute of Limitations

Defendants contend that all plaintiffs' claims are timebarred. The court considers each claim separately in order to determine whether plaintiffs' claims comply with the statute of limitations.

#### A. Claims Under the Securities Act of 1933

Section 11 of the 1933 Securities Act prohibits the issuance of false or misleading securities registration statements, including the portion of the registration statement that circulates as the prospectus. 15 U.S.C. § 77k; *Short v. Belleville Shoe Mfg. Co.,* 908 F.2d 1385, 1390 (7th Cir. 1990). Section 12(2) of the Securities Act imposes civil liability on any person who makes a false or misleading statement in the offer or sale of a security, whether in an oral communication or prospectus. 15 U.S.C. § 77*l*(2); *Ambling v. Blackstone Cattle Co., Inc.,* 658 F.Supp. 1459, 1462 (N.D.Ill.1987). Section 13 of the 1933 Securities Act sets forth the statute of limitations for actions brought under §§ 11 and 12(2) as

one year after the discovery of the untrue statement or the omission, or after such discovery should have been made

by the exercise of reasonable diligence.... In no event shall any such action be brought to enforce a liability created under section 11 ... more than three years after the security was bona fide offered to the public, or under section 12(2) more than three years after the sale.

15 U.S.C. § 77m.

### 1. *The Three–Year Limit*

■ Section 13 clearly bars all actions not commenced within three years after the sale of the security or the first bona fide public offering of the security. *Id.* Equitable tolling doctrines do not extend the period of limitations for §§ 11 and 12(2) actions beyond this absolute limit of three years. *Short,* 908 F.2d at 1391. Counts ten through thirteen claim violations of §§ 11 and 12(2) on behalf of the MIF and Land Fund II subclasses. Count fourteen, brought on behalf of the MILP III investors, charges defendants with violating § 12(2). With respect to the MIF and Land Fund II subclasses, plaintiffs filed suit within the three-year outer boundary mandated by § 13. The four plaintiffs representing the Land Fund II subclass allegedly purchased their shares during the initial public offering, between August 25, 1987 and January 31, 1988. The entire period of the initial public offering falls within three years of the latest possible date this action could be considered filed, April 30, 1990.[6] Similarly, the nine MIF subclass plaintiffs who purchased their shares during MIF's initial public offering, between March 30, 1988 and October 31, 1988, filed their claims well within three years of these alleged purchases.[7] The same is not true, however, for the § 12(2) claim of the MILP III subclass. The complaint alleges that plaintiffs John Falco and Joseph Iantuono purchased their units of MILP III during the initial public offering, between December 10, 1986 and June 30,

1987. The complaint fails to state the exact dates on which these plaintiffs made their purchases. Thus, according to the complaint, Falco and Iantuono might have purchased their units on the first day of the offering period, December 10, 1986. The first individual complaint against any defendant in this action was filed on December 22, 1989, over three years after December 10, 1986. Therefore, the MILP III subclass has failed to plead facts showing compliance with the three year limitation period as required under § 13. *See Fisher v. Samuels,* 691 F.Supp. 63, 71 (N.D.Ill.1988) (plaintiff asserting claims under §§ 11 or 12(2) of the 1933 Act must plead facts showing compliance with statute of limitations); *Ambrosino v. Rodman & Renshaw, Inc.,* 635 F.Supp. 968, 972 (N.D.Ill.1986) (plaintiffs do not meet the pleading requirement by merely reciting in the complaint that the action was commenced within the limitations period). Accordingly, count fourteen is dismissed.[8]

### 2. *The One–Year Limit*

■ Having determined that the MIF and Land Fund II subclasses filed suit within the maximum three-year limit, the court must still determine whether these plaintiffs have complied with the one-year limitations period mandated by § 13. The one-year period begins to run when the investor either knows or in the exercise of reasonable diligence should have discovered the facts on which the suit is based. *Fisher,* 691 F.Supp. at 71, citing *Norris v. Wirtz,* 818 F.2d 1329, 1334 (7th Cir.), *cert. denied,* 484 U.S. 943, 108 S.Ct. 329, 98 L.Ed.2d 356 (1987). When the defendant lies and the plaintiff does not reasonably investigate, the time starts to run immediately. *Norris,* 818 F.2d at 1334. In order to comply with the statute of limitations, the complaint must set forth the time and circumstances of discovery of the untrue

---

**6.** On this date, plaintiffs filed their consolidated class action and derivative complaint.

**7.** The court dismisses the claims of the three plaintiffs who allegedly invested in MIF but failed to allege the date they purchased the MIF securities.

**8.** Count fourteen's claim for "controlling person" liability under § 15 of the 1933 Securities Act, 15 U.S.C. § 77o, is also dismissed, because there can be no controlling person liability under § 15 without primary liability under § 11 or 12(2).

statement or omission, state the reasons why discovery was delayed if more than one year has elapsed since the statement or omission was made, and describe plaintiff's diligent efforts to seek discovery. *Ambrosino*, 635 F.Supp. at 972.[9]

Plaintiffs in the MIF and Land Fund II subclasses base their securities fraud claims on various documents, releases and financial statements allegedly issued by MIF and Land Fund II during the class period. Under § 11, however, the only documents that bear any legal relevance are the registration statement and the prospectus included in the registration statement. In addition, § 12(2) punishes false or misleading statements made in connection with the offer or sale of securities. The complaint fails to supply dates of purchase for any plaintiffs except those who bought securities from the Funds during the initial public offerings. The court therefore must limit its analysis of the § 12(2) claims to statements made in the prospectuses circulated with the initial public offerings.

■ The complaint alleges that the Land Fund II prospectus, dated August 25, 1987, and the MIF prospectus, dated March 30, 1988, contained a number of materially misleading statements. Complaint ¶¶ 65–66, 68–69, 72, 212–15. The Land Fund II and MIF plaintiffs first discovered the misleading nature of the prospectuses on November 14, 1989, when Land Fund II and MIF revealed in their 1989 third quarter Form 10–Q reports the "critical role that VMS Realty Partners' financial condition played in [Land Fund II and MIF]s' success." Complaint ¶¶ 73, 218. Because discovery occurred more than one year after the prospectuses were issued, the Land Fund II and MIF plaintiffs must state why their discovery was delayed. *Ambrosino*, 635 F.Supp. at 972. In addition, the Land Fund II and MIF plaintiffs must allege that they exercised reasonable diligence in seeking discovery of the fraud. *Id.* Defendants argue that plaintiffs have not met this requirement. Plaintiffs insist that they need not describe their efforts to discover the fraud, because, they contend, they have alleged that the defendants actively concealed their fraud.

#### a. Fraudulent Concealment

Under the doctrine of fraudulent concealment, if defendants took additional affirmative steps after committing the fraud to conceal their conduct, the statute of limitations is tolled until plaintiffs actually discover the fraud. *Davenport v. A.C. Davenport & Son Co.*, 903 F.2d 1139, 1142 (7th Cir.1990); *Robin v. Doctors Officenters Corp.*, 686 F.Supp. 199, 207 (N.D.Ill.1988). This doctrine relieves plaintiffs of the obligation to use due diligence to discover the fraud. *Davenport*, 903 F.2d at 1142. However, to invoke the doctrine of fraudulent concealment, "plaintiff[s] *cannot* ignore the obvious danger signals ... and there is no license to ignore events giving rise to strong suspicion." *Fisher*, at 72 (emphasis in original) (citations omitted). In addition, federal equitable tolling requires defendants to take additional *affirmative* steps of concealment after committing the fraud; mere silence by a defendant who is under a fiduciary duty to disclose fraud is not sufficient to trigger the fraudulent concealment tolling rule. *Davenport*, 903 F.2d at 1142.

Plaintiffs argue that the complaint states with particularity affirmative acts of fraudulent concealment. Plaintiffs cite several paragraphs in the complaint as examples. However, the majority of those paragraphs do not contain allegations of fraudulent concealment directed at the MIF or Land Fund II plaintiffs. Instead, paragraphs 94, 131, 132, 155, 159, 175, 177 and 198 allege that the Income Trust, MILP II, MILP III, Hotel Fund and Land Trust issued fraudulent financial reports during the class period in an effort to conceal the misleading nature of their investment portfolios. In addition, paragraphs 32, 34 and 36 contain general allegations that the "prospectuses and other documents issued by the Funds"

---

**9.** *Ambrosino* involved claims under § 12(2) of the 1933 Securities Act. Because the statute of limitations set forth in § 13 of the Securities Act is the same for §§ 12(2) and 11, the *Ambrosino* interpretation of the statute of limitations applies to claims arising under § 11.

were materially misleading. These general accusations do not identify specific documents or specify when these purportedly misleading documents were issued, as required by Fed.R.Civ.P. 9(b). Thus, they do not support plaintiffs' claims of fraudulent concealment.

Plaintiffs point to the allegations of loan churning as examples of defendants' efforts to mask the existence of troubled borrowers. However, none of the loan churning allegations in the complaint involve MIF or Land Fund II. Plaintiffs also refer to a letter sent to all investors dated June 2, 1989, in which Joel Stone denied any problems with the Funds and stressed the purportedly safe and secure nature of the Funds' activities. Complaint ¶ 66(f). While this letter may constitute a cover-up attempt by defendants, the letter was sent too late to have any tolling effect on the one-year statute of limitations period. By June 2, 1989, the one-year period for discovery of the misleading MIF and Land Fund II prospectuses had already run. Thus, plaintiffs cannot use the Stone letter as a reason they did not discover the fraud within one year of the misleading prospectuses' issuance.

Plaintiffs argue that the documents referred to in ¶¶ 70 and 212 of the complaint constitute fraudulent concealment. Paragraph 70 of the complaint states

> ... during the Class Period, [MIF] disseminated documents, including its 1988 Annual Report to Shareholders, Form 10–K for the year ended December 31, 1988, and Forms 10–Q for the periods ending March 1988 through September 1989, which ... failed to disclose that [MIF] was dependent upon the financial condition of VMS Realty Partners.

As an example of the statements contained in these reports, plaintiffs quote MIF's Form 10–Q for the quarter ended June 30, 1989. Complaint ¶ 70. As with the June 2, 1989 letter from Joel Stone, this document was circulated to MIF investors too late to have any tolling effect on the one-year limitation period. Paragraph 70 omits quotations from the earlier documents alleged to contain misleading statements. These

earlier documents therefore cannot support plaintiffs' fraudulent concealment claims. Fed.R.Civ.P. 9(b). In any event, a fiduciary's failure to disclose, without more, does not amount to an affirmative act of fraudulent concealment. *Davenport*, 903 F.2d at 1142 (fraudulent concealment doctrine not triggered by plaintiff's claims that fiduciary's ongoing failure to disclose facts material to the sale of securities "lulled" the plaintiff so as to prevent her from uncovering the defendant's fraudulent acts).

Nor can plaintiffs rely on paragraph 212 of the complaint to support allegations of fraudulent concealment. Paragraph 212(a) states that Land Fund II's prospectus implicitly represented that its loans would approximate arm's-length transactions, notwithstanding Land Fund II's practice of lending to affiliates of VMS Realty Partners. Plaintiffs allege that this implied representation was misleading, because Land Fund II made loans to affiliated borrowers that were secured by overcollateralized properties. Complaint ¶ 212(a). The paragraph then states:

> [a]ll subsequent documents circulated to the investing public during the Class Period, including [annual reports to shareholders and Forms 10–K for the years ended December 31, 1987 through 1988, and Forms 10–Q for the periods ending September 30, 1987 through September 30, 1989], were materially misleading in failing to reveal that [Land Fund II] was engaging in such a practice, despite the defendants' duty to make such a disclosure.

*Id.* Paragraph 212(a) fails to quote any misleading language from these subsequent documents. Nor have plaintiffs provided copies of these documents indicating to defendants and the court their misleading nature. Furthermore, plaintiffs cannot trigger the fraudulent concealment doctrine by merely alleging that defendants remained silent while under a duty to disclose. *Davenport, supra.* Therefore, the references to these documents do not adequately allege fraudulent concealment.

Subsection (b) is the only other portion of paragraph 212 that refers to documents

other than the Land Fund II prospectus. Paragraph 212(b) alleges that Land Fund II's prospectus stated its primary investment objectives were to "preserve and protect [Land Fund II]'s capital" and "provide for quarterly cash distributions." Complaint ¶ 212(b). According to this paragraph of the complaint, "other documents disseminated during the Class Period, including reports to shareholders ... and Land Fund II's Forms 10–K for 1987 and 1988" reiterated the Fund's primary investment objectives. Complaint ¶ 212(b). Plaintiffs do not indicate why these statements were misleading; even if they did, these general statements of Land Fund II's objectives do not amount to fraudulent concealment.

Plaintiffs' final argument with respect to fraudulent concealment is that VMS Realty Partners and its affiliates constantly sought to raise funds through public offerings shortly after completing prior financing. Plaintiffs contend that the purpose of this almost constant state of registration was to mask the serious liquidity problems of the Funds and their affiliated borrowers. Complaint ¶ 44. Even if the court accepts this inference, defendants' alleged fundraising could not operate to conceal any misleading statements in MIF's or Land Fund II's prospectuses. In other words, disguising the liquidity problems of the Funds and their borrowers has little to do with concealing defendants' alleged failure to disclose that the Funds and borrowers depended heavily on VMS Realty Partners. Thus, defendants' constant fund-raising does not constitute fraudulent concealment.

### b. Equitable Tolling in the Absence of Fraudulent Concealment

In situations where defendants did not actively conceal fraud, the statute of limitations still may be equitably tolled until the date the plaintiffs discovered the fraud. To succeed on this second theory of equitable tolling, plaintiffs must allege and prove that they remained unaware of the fraud and exercised due diligence in attempting to discover it. *Teamsters Local 282 Pension Trust Fund v. Angelos,* 815 F.2d 452, 456 (7th Cir.1987); *McCool v.* *Strata Oil Co.,* 724 F.Supp. 1232, 1235–36 (N.D.Ill.1989). Plaintiffs admit that they have not alleged due diligence. Plaintiffs' Response at 37.

Because the MIF and Land Fund II plaintiffs have not complied with the one-year limitation period, their claims under the 1933 Securities Act are time-barred. Accordingly, the court dismisses counts ten through thirteen.

### B. Claims Under the Securities Exchange Act of 1934

The Seventh Circuit recently adopted § 13 of the 1933 Securities Act as the applicable limitations rule for claims arising under § 10(b) of the 1934 Securities Exchange Act. *Short v. Belleville Shoe Mfg. Co.,* 908 F.2d 1385 (7th Cir.1990). Under *Short,* § 10(b) claims must be filed within one year of the date that a reasonable investor knew or should have known of the claim, but in no event later than three years after the date of sale. *Id.* at 1390. Equitable tolling doctrines do not extend the period of limitations past the three-year absolute limit. *Id.* at 1391, citing *Norris,* 818 F.2d at 1332.

### 1. Retroactive Application of § 13 to § 10(b) Claims

■ Defendants argue that *Short* governs plaintiffs' § 10(b) claims; plaintiffs maintain that the new limitations rule should not be applied retroactively. Although the *Short* court applied the new limitations rule to the plaintiff's § 10(b) claims, it expressly reserved for the future a ruling on the issue of retroactive application of the new rule for all § 10(b) claims. *Short,* 908 F.2d at 1389–90. Plaintiffs rely on *Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971) to support their position. In *Chevron,* the Supreme Court articulated three factors germane to determining whether to apply a rule retroactively. Under *Chevron,* this court must consider (1) whether the new rule overrules clear past precedent on which litigants may have relied; (2) whether retroactive application of the new rule will further or retard its operation; and (3) whether retroactive application would im-

pose injustice or hardship. *Id.* at 106–07, 92 S.Ct. at 355. Plaintiffs point to *Kayne v. PaineWebber Inc.*, 703 F.Supp. 1334 (N.D.Ill.1989), to support their opposition to retroactive application of the new limitations rule. In *Kayne*, Judge Duff concluded that the first and third *Chevron* factors weighed heavily against retroactive application of the proposed new limitations rule to § 10(b) claims. *Id.* at 1344. *Kayne* was decided before the Seventh Circuit adopted the new limitations rule for § 10(b) claims. The issue in *Kayne*, therefore, was not simply whether to apply the new limitations rule retroactively, but whether to adopt a new limitations rule at all. Without a clear directive from the Seventh Circuit, the *Kayne* court declined to adopt the new limitations rule because, among other things, it "would create an injustice for those litigants who have relied on the Seventh Circuit's repeated application of [state courts'] limitations period[s] in § 10(b) and Rule 10b–5 cases." *Id.* In so holding, the court noted that PaineWebber had not argued any special facts that might warrant retroactive application despite the court's broad ruling that the new limitations period should not be so applied. *Id.* at 1344 n. 4.

■ Defendants in the present case argue persuasively that the particular facts here merit application of the new rule retroactively. Plaintiffs first became aware of their claims on November 14, 1989, when defendants publicly announced VMS Realty Partners' problems. Response at 41; Complaint ¶¶ 47–58. Because plaintiffs were unaware of their claims, they could not have delayed filing suit in reliance on Illinois law. Indeed, the first individual suit was filed just over one month after the November 14, 1989 announcement. Plaintiffs have not shown the court how they have relied on the state limitations period, or that they would suf-

fer undue hardship or injustice if the new rule was applied.[10] Thus, the first and third factors of *Chevron* favor retroactive application. Indeed, the Seventh Circuit applied the new limitations rule to the litigants in *Short*, noting that "[the plaintiff] cannot have relied on Illinois law, because she claims to have been unaware of the basis for litigation until a short time before filing suit." *Id.* at 1390. *See also Gatto v. Meridian Medical Assocs., Inc.*, 882 F.2d 840, 843–44 (3d Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1136, 107 L.Ed.2d 1041 (1990) (first and third *Chevron* criteria not established where appellants could not have relied on a longer period of limitations); *Hill v. Equitable Trust Co.*, 851 F.2d 691 (3d Cir.1988) (retroactively applying § 13's period of limitations to § 10(b) claims).

As to the second *Chevron* criteria, retroactive application would further the purposes of the new limitations rule by removing the "daunting" tasks of determining which state statute applies and whether federal or state tolling rules govern. *Short*, 908 F.2d at 1388; *see also Norris*, 818 F.2d at 1332 ("[d]eciding which features of state periods of limitations to adopt for which federal statutes wastes untold hours").[11]

In sum, all three *Chevron* considerations militate in favor of applying the rule announced in *Short* to the present case. Therefore, plaintiffs' § 10(b) claims are governed by the statute of limitations set forth in § 13 of the 1933 Securities Act.

### 2. *Claims Under §§ 10(b) and 20(a) and Rule 10b–5*

Counts one through ten allege violations of §§ 10(b) and 20(a) of the 1934 Securities Exchange Act, and Rule 10b–5 promulgated thereunder. For the reasons discussed under heading "A" above, the 1934

---

**10.** Plaintiffs claim they would be prejudiced because they relied on a rule in which equitable tolling principles allowed them to bring suit more than one year from the date on which they should have discovered the fraud. The new rule, however, does not abolish equitable tolling principles. Rather, it limits the allowable tolling period to no more than two years

after the claim should have been discovered. *Short*, 908 F.2d at 1391.

**11.** Plaintiffs do not contest this point, but instead argue that "any clarification that would result [from applying the new rule] could not possibly outweigh the force of the first and third factors." Response at 40, quoting *Kayne*, 703 F.Supp. at 1344.

Securities Exchange Act claims of the MILP III, MIF an Land Fund II subclasses are precluded by the statute of limitations. Accordingly, counts one, five and eight are dismissed.

 Failure to comply with the statute of limitations is but one of several reasons for dismissing the 1934 Act claims of the Income Trust, MILP I an Land Trust subclasses. The plaintiffs representing these subclasses failed to allege the dates they purchased their securities. This omission is fatal to the claims of these plaintiffs, for plaintiffs are obliged to plead affirmative facts showing compliance with the statute of limitations. *Fisher*, 691 F.Supp. at 71; *Ambling*, 658 F.Supp. at 1462. The three-year maximum limitations period under § 13 of the 1933 Act begins to run on the date of sale. Plaintiffs cannot show that they filed suit within three years of the date of sale if they have not alleged these dates.[12] Therefore, counts two, three and seven must be dismissed.

 Plaintiffs representing the Hotel Fund subclass, Marie Matson and David E. Robbins, allege that they purchased Hotel Fund securities during the initial public offering, between July 12, 1985 and January 6, 1986. Complaint ¶¶ 12(v, bb). Even assuming that both Matson and Robbins purchased securities on the last day of the initial public offering, more than three years elapsed before the January 11, 1990 class action was filed.[13] Thus, the Hotel Fund plaintiffs have not met their burden of pleading facts to show compliance with the three-year period of limitations under § 13. Count six is dismissed.

Plaintiffs John and Ilana Falco, and Atlantic Electric Supply Corporation Pension Plan invested in MILP II between January 2, 1986 and July 3, 1986. Complaint ¶¶ 12(c, k, *l*). As with the Hotel Fund subclass, the MILP II plaintiffs cannot escape the mandate of § 13's absolute

three-year limitation period. That period expired on July 3, 1989, before any claim against any defendant was filed. The court must therefore dismiss count four with prejudice.

Plaintiffs bring their remaining 1934 Securities Exchange Act claim on behalf of the entire class against all defendants for violations of §§ 10(b), 20(a) and Rule 10b–5. As none of the subclasses have complied with the statute of limitations, the claims on behalf of all eight subclasses collectively are also time-barred. Accordingly, count nine is dismissed.

### C. RICO Claims

Plaintiffs' RICO claims are governed by a four-year limitations period. *Agency Holding Corp. v. Malley–Duff & Assocs., Inc.*, 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987); *Davenport*, 903 F.2d at 1143. The Seventh Circuit has yet to determine when a RICO cause of action accrues for limitations period purposes. Other judges of this court and courts in other circuits have adopted one of two standards for RICO accrual. Under the first standard—the "last predicate act" rule—the limitations period begins to run when a defendant commits the last predicate act of the racketeering pattern. *Norris v. Wirtz*, 703 F.Supp. 1322, 1326 (N.D.Ill.1989) (Marovich, J.). Several judges of this court adhere to this standard. *See id.; Citicorp Savings of Illinois v. Streit*, No. 84 C 7471, 1987 WL 9318 (N.D.Ill. April 3, 1987) (1987 WL 9318) (McGarr, J.); *County of Cook v. Berger*, 648 F.Supp. 433, 433–35 (N.D.Ill. 1986) (Kocoras, J.); *Newman v. Wanland*, 651 F.Supp. 20, 22 (N.D.Ill.1986) (Williams, J.).

 Under the second standard, the RICO claim accrues at the time the plaintiff discovers or should have discovered that she sustained an injury from a RICO violation. *McCool v. Strata Oil Co.*, 724

---

12. Plaintiffs have had ample opportunity to allege purchase dates. Defendants' motion to dismiss clearly points out the absence of purchase dates for many of the investors in the Funds. Plaintiffs made no attempt to address this pleading defect in their response, nor did they move

to amend their complaint to allege the missing purchase dates.

13. The January 11, 1990 class action was the first case filed on behalf of investors in all Funds, naming all the Funds as defendants.

F.Supp. 1232, 1237 (N.D.Ill.1989) (Bua, J.); *Bowling v. Founders Title Co.*, 773 F.2d 1175, 1178 (11th Cir.1985), *cert. denied*, 475 U.S. 1109, 106 S.Ct. 1516, 89 L.Ed.2d 915 (1986). The "discovery" rule enjoys widespread support among other circuits. *See, e.g., id.; Riddell v. Riddell Washington Corp.*, 866 F.2d 1480, 1489–90 (D.C.Cir. 1989); *Pocahontas Supreme Coal Co., Inc. v. Bethlehem Steel Corp.*, 828 F.2d 211, 230 (4th Cir.1987); *Compton v. Ide*, 732 F.2d 1429, 1433 (9th Cir.1984); *Alexander v. Perkin Elmer Corp.*, 729 F.2d 576, 577 (8th Cir.1984). In addition, at least two other judges in this district follow the discovery rule. *See McCool*, 724 F.Supp. at 1237 (Bua, J.); *Abernathy v. Erickson*, 657 F.Supp. 504, 507–08 (N.D.Ill.1987) (Bua, J.); *Electronic Relays (India) Pvt., Ltd. v. Pascente*, 610 F.Supp. 648, 653 (N.D.Ill. 1985) (Hart, J.). In the present case, the task of determining the appropriate rule is made easier by the parties, who agree that the discovery rule should govern. Response at 42; Reply at 10. Therefore, the statute of limitations for plaintiffs' RICO claims began to run when plaintiffs either discovered or should have discovered that they sustained an injury from defendants' alleged acts of racketeering activity.

We must first determine when these alleged racketeering acts occurred. The alleged pattern of racketeering activity consists of defendants' acts of securities fraud, in violation of § 10(b) of the 1934 Securities Exchange Act, mail fraud, in violation of 18 U.S.C. § 1341, and wire fraud, in violation of 18 U.S.C. § 1343. The securities fraud allegations center around defendants' sale of the Funds' securities. Complaint ¶ 358. The wire fraud allegations are based on defendants' alleged use of telephones in connection with the sale of the Funds' securities. *Id.* Plaintiffs base their mail fraud claims on defendants' alleged use of the mails to disseminate information relating to the Funds "in order to induce persons to purchase the Funds' securities." *Id.* Therefore, all of the alleged predicate racketeering acts occurred either on the dates the prospectuses were issued, or on the dates plaintiffs purchased their securities. Since none of the plaintiffs who purchased securities during the initial public offering allege their precise date of purchase, the court assumes, for the purposes of the statute of limitations, that the plaintiffs purchased their securities on the first day of the initial public offering for each of the Funds. The prospectuses for each Fund were also issued on the first day of the Funds' public offerings. Thus, the court considers the first date of the initial public offering for each Fund as the date defendants allegedly committed a predicate racketeering act.

■ The initial public offerings for the Land Trust, Land Fund II, MIF and MILP III all took place less than four years before January 11, 1990, when all Funds were named as defendants for the first time.[14] Thus, the RICO claims with respect to these Funds do not run afoul of the statute of limitations. As for the remaining four Funds, the court need not decide at this time whether any equitable tolling doctrines forestall the statute of limitations. Plaintiffs' RICO claims suffer from numerous deficiencies that require dismissal under Fed.R.Civ.P. 9(b) and 12(b)(6).

### D. Common Law Fraud Claims

The common law claims in counts fifteen through thirty-nine are governed by a five-year period of limitations. Ill.Stat.Ann. ch. 110, para. 13–205 (Smith–Hurd 1984). Except for the Income Trust and MILP I securities, all of the Funds' securities were sold within five years of the latest possible date this suit could be considered filed, April 30, 1990. As to the Income Trust and MILP I, plaintiffs fail to allege any purchase dates. Thus, it is impossible to determine whether the statute of limitations bars plaintiffs' common law claims with respect to their purchase of the Income Trust and MILP I securities.

---

**14.** The Land Trust commenced its public offering on September 9, 1986. MILP III's public offering started on December 10, 1986. The public offering for Land Fund II began on August 25, 1987, and MIF began its public offering on March 30, 1988.

## II. Motion to Dismiss Based on Rule 9(b)

██ Defendants move to dismiss all counts sounding in fraud for failure to comply with Fed.R.Civ.P. 9(b). Rule 9(b) requires that

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Rule 9(b)'s particularity requirement furthers two basic purposes: (1) to reasonably notify defendants of their roles in the alleged scheme so that they may prepare a responsive pleading; and (2) to "safeguard potential defendants from lightly made claims charging commission of acts that involve some degree of moral turpitude." *Bankers Trust Co. v. Old Republic Ins. Co.*, 697 F.Supp. 1483, 1484–85 (N.D.Ill. 1988) (citations omitted). *See also O'Brien v. Nat'l Property Analysts Partners*, 719 F.Supp. 222, 225 (S.D.N.Y.1989). These purposes are usually satisfied if the complaint sets forth the time, place, and substance of the alleged misrepresentations, as well as who made the statements and the method by which the misrepresentation was communicated to the plaintiff. *Sears v. Likens*, 912 F.2d 889 (7th Cir.1990); *Flournoy v. Peyson*, 701 F.Supp. 1370, 1374 (N.D.Ill.1988). However, conclusory allegations of fraud and averments of state of mind are insufficient to satisfy Rule 9(b). *Flynn v. Merrick*, 881 F.2d 446, 449 (7th Cir.1989). In addition, a complaint does not satisfy Rule 9(b) if it makes blanket allegations that fail to specifically identify the defendants who made each misrepresentation or omission. *Likens*, at p. 893 (complaint deficient because it "lump[ed] all the defendants together and d[id] not specify who was involved in what activity"); *Coronet Ins. Co. v. Seyfarth*, 665 F.Supp. 661, 666 (N.D.Ill.1987) ("[p]laintiffs may not 'lump' defendants together in general allegations of fraudulent activity, im-plying that each defendant is responsible for the statements and actions of others").

Defendants contend that the complaint defies Rule 9(b)'s mandate for particularity in four ways: (1) the complaint fails to differentiate the roles of each defendant; (2) the complaint does not identify the source of alleged misrepresentations; (3) the complaint does not properly plead fraud upon information and belief; and (4) the complaint fails to state when the alleged violations occurred.

Contrary to defendants' assertion, the complaint for the most part does not lump all defendants together without alleging each defendant's fraudulent conduct. The complaint lists, in painstaking detail, all forty-nine defendants and their alleged roles in the fraudulent scheme. In addition, plaintiffs allege the dates of the public offering of each Fund's securities, and the date each Fund issued its prospectus in connection with the public offering. Furthermore, plaintiffs quote extensively from the offering prospectus of each Fund and explain why they believe the statements were misleading.[15] Complaint ¶¶ 65–66, 68–69, 72, 92–93, 109–10, 113, 130, 132–33, 137, 154–57, 175, 177, 179, 196–97, 212–15. Therefore, plaintiffs have set forth the requisite "who, what, when, where and how" with respect to the securities fraud charges against each defendant. *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.) *reh'g denied*, 1990 WL 57464, 1990 U.S.App. LEXIS 9787 (1990). *See also Flournoy*, 701 F.Supp. at 1374–75 (finding plaintiffs' allegations of fraud sufficient); *Ambling*, 658 F.Supp. at 1467 (plaintiffs adequately alleged defendants' fraudulent scheme of obtaining investors in limited partnership by issuing misleading prospectus).

██ Similarly, defendants' objection to allegations based on information and belief are without merit as to many of plaintiffs' allegations. Plaintiffs aptly point out that in securities fraud cases where matters are

---

**15.** Plaintiffs also claim that each Fund issued misleading documents and reports to its shareholders after they purchased securities in the Fund. As the discussion below indicates, these documents may not be considered as part of plaintiffs' securities fraud claim, because plaintiffs have not alleged that anyone purchased securities in a particular Fund in connection with these statements.

**1392**

particularly within the knowledge of the defendants, Rule 9(b) does not preclude pleadings of fraud on information and belief, so long as the complaint includes facts upon which the belief is based. *Duane v. Altenburg,* 297 F.2d 515, 518 (7th Cir.1962); *Bruss Co. v. Allnet Communication Services, Inc.,* 606 F.Supp. 401, 405 (N.D.Ill. 1985). Plaintiffs' 184–page complaint includes a number of facts to support their allegations of fraud. However, some of plaintiffs' fraud claims are not based on factual allegations. Because application of Rule 9(b) to these information and belief pleadings overlaps with the considerations attendant to a Rule 12(b)(6) motion, the 9(b) concerns are addressed in the Rule 12(b)(6) discussion. In addition, the Rule 9(b) deficiencies regarding the RICO allegations are taken up in the Rule 12(b)(6) discussion of the RICO claims.

■ Defendants' contention that count nine fails to comply with Rule 9(b)'s mandate has merit. In count nine, plaintiffs assert §§ 10(b) and 20(a) claims on behalf of all plaintiffs against all defendants for alleged misrepresentations and omissions in "public statements [made] during the Class Period." Count nine effectively charges each defendant with fraud in connection with all eight Funds, despite the fact that many defendants remained uninvolved with VMS Realty Partners or the Funds until quite late in the alleged fraudulent scheme. For example, the Xerox defendants did not become involved with the Funds until February 1987, when XCC became a 25 percent owner of VMS Realty Partners. Thus, the Xerox defendants cannot share liability in connection with any of the six offering prospectuses issued before February 1987. Similarly, count nine charges Prudential–Bache Securities and Prudential–Bache Properties with liability for fraud in connection with all the Funds, even though plaintiffs allege that Prudential–Bache Securities was involved with the offerings of only four of the eight Funds, and Prudential–Bache Properties in only two. In addition, many of the defendants served on the board of directors for some, but not all, of the Funds. Nevertheless,

count nine charges these defendants with fraud in connection with all eight Funds.

As the foregoing examples show, count nine impermissibly lumps all defendants together and makes blanket allegations against them without alleging the place, time or substance of the fraud, much less the individual role each defendant played. Plaintiffs contend that count nine should be considered in the context of counts one through eight, which provide detailed allegations about each defendant's role in connection with a particular Fund. "Count nine," say plaintiffs, "build[s] on the details previously set forth in the fraud counts brought on behalf of each of the eight subclasses, [and] charges all defendants with having participated in a single overall fraudulent scheme." Response at 22. While this may be true, the court cannot accept the vague allegations in count nine, especially because count nine seeks to hold *all* defendants responsible for *all* alleged misrepresentations, regardless of the extent of each defendant's involvement in the misrepresentation. The court recognizes that in a fraud claim against a group of corporate insiders who acted collectively, the requirements of particularity may be relaxed, particularly when the defendants control much of the information concerning the fraud. *Carter v. Signode Industries, Inc.,* 694 F.Supp. 493, 500 (N.D.Ill.1988). However, in this case, plaintiffs already have information as to each defendant's involvement in each of the Funds; such information is admittedly alleged in the complaint. The allegations of fraud against the various defendants in the first eight counts exhaust the extent of liability for each defendant under the 1934 Securities Exchange Act. Count nine adds nothing to the first eight counts; it merely attempts to impose liability on all defendants for all fraudulent acts. Count nine must be dismissed.

As to the remaining counts sounding in fraud, the particular Rule 9(b) objections raised by defendants lack merit. Nevertheless, the court finds that plaintiffs have failed to comply with Rule 9(b) in alleging certain elements of their fraud and RICO claims. Because the failure to adequately

allege the elements of a cause of action is the focus of a motion to dismiss under Rule 12(b)(6), the Rule 9(b) deficiencies in this respect are taken up in the discussion of the motion to dismiss for failure to state a claim.

### III. Rule 12(b)(6) Motion to Dismiss

■ Dismissal on a Rule 12(b)(6) motion is proper where it is clear that no relief could be granted under any set of facts consistent with the allegations in the complaint. *Robin v. Doctors Officenters Corp.*, 686 F.Supp. 199, 207 (N.D.Ill.1988), citing *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232–2233, 81 L.Ed.2d 59 (1984).

### A. Securities Fraud Claims Under the 1934 Securities Exchange Act

Counts one through nine allege primary and aiding and abetting liability under § 10(b) and Rule 10b–5, and controlling person liability pursuant to § 20(a) of the 1934 Securities Exchange Act.[16] The second paragraph of each count lists the defendants charged with liability for conduct in connection with the particular Fund. The plaintiffs sue each particular Fund, all "controlling persons" of the Fund, the advisors and guarantors of the Fund, and the underwriters for the Fund's securities, on theories of primary liability, aiding and abetting liability, and controlling person liability.

#### 1. *Primary Liability*

■ To establish a primary violation of § 10(b) and Rule 5(b), plaintiffs must demonstrate that the defendants

(1) in connection with a securities transaction, (2) made an untrue statement of material fact or omitted a material fact that rendered the statements made misleading, (3) with the intent to mislead, and (4) which caused the plaintiffs' loss.

*Schlifke v. Seafirst Corp.*, 866 F.2d 935, 943 (7th Cir.1989). The court addresses each of these four criteria separately.

#### a. *The Transaction Requirement*

■ It is well settled that only purchasers or sellers of securities may assert claims for securities fraud under the 1934 Act. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 731, 95 S.Ct. 1917, 1923, 44 L.Ed.2d 539 (1975) ("plaintiff class for purposes of § 10(b) and Rule 10b–5 private damage actions is limited to purchasers and sellers of securities"); *Norris v. Wirtz*, 719 F.2d 256, 258 (7th Cir.1983), *cert. denied*, 466 U.S. 929, 104 S.Ct. 1713, 80 L.Ed.2d 185 (1984); *Beck v. Cantor, Fitzgerald & Co., Inc.*, 621 F.Supp. 1547, 1555 (N.D.Ill.1985) (rejecting liability premised upon alleged misrepresentations and omissions that occurred after plaintiff purchased his stock). While the complaint alleges that each named plaintiff purchased securities from a particular Fund, defendants are correct in observing an "egregious" defect in the complaint: plaintiffs' failure to allege specific purchase dates. Because liability under § 10(b) and Rule 10b–5 must be premised on plaintiffs' reliance on misrepresentations in purchasing the Funds' securities, the dates of purchase are essential to their claim. Without purchase dates, it is impossible to determine whether certain investors could have purchased their securities "in connection with" the alleged misrepresentations contained in the eight offering prospectuses, the Forms 10–K and 10–Q for each Fund, and the year-end shareholder reports for each Fund. It is also impossible to determine whether the 1934 Act claims are barred by the statute of limitations, which expires three years after the sale of the security, without exception. Thus, the court must dismiss the claims of all plaintiffs who failed to provide any references to when they made their investments in a particular Fund.[17]

---

**16.** Counts one through eight each present allegations concerning a particular Fund. Count nine sues all defendants collectively for securities fraud under the 1934 Securities Exchange Act.

**17.** Those plaintiffs are: Jeffrey Alexander; Holly Parmenter; Stewart Eisenberg; Walter D. Ford, Sr.; John Holcomb; Mary Marganos; Quaker Valley Meats, Inc.; Bertrand Sellier; Judith Ludwig; Cook Bros. MPP; Cook Bros. PSR; Edward McDaid; Barbara Tepperman; Lewis D. Rubin; Patrick Reed; and Alan Hess.

The only indication of purchase dates for any plaintiff is found in the complaint's allegations that some plaintiffs invested in a particular Fund during the Fund's initial public offering. At that time, the only documents these plaintiffs could have relied on were the offering prospectuses. Thus, the court must limit its consideration of plaintiffs' 1934 Act claims to the statements made in the prospectuses. Any misleading statements in subsequent documents, such as annual shareholder reports or Forms 10-k and 10-Q are not relevant to plaintiffs' securities fraud claims because the statements were not made "in connection with" a purchase or sale of securities.

### b. Material Misrepresentations or Omissions

■ For every defendant charged with primary liability under § 10(b) and Rule 10b-5, plaintiffs must establish that he or she made misrepresentations or omissions of material fact. Plaintiffs allege primary liability against the Funds, the Funds' officers, directors, trustees, underwriters, guarantors, advisors and appraisers. In addition, plaintiffs charge various defendants with primary liability because of their association with VMS Realty Partners. Plaintiffs' dragnet approach to establishing liability must be stopped short at this point, because the vast majority of the forty-nine defendants could not possibly be primary violators. All of the alleged misleading statements were issued by the eight Funds. The guarantors, underwriters, advisors and appraisers were not responsible for issuing the prospectuses or any other alleged misleading document.[18] Thus, the only defendants who could conceivably be charged with primary liability are the Funds, and certain "controlling persons."[19] *DiLeo,* 901 F.2d at 626–28.

The Seventh Circuit explained in *Rowe v. Maremont Corp.,* 850 F.2d 1226, 1223 (7th Cir.1988) that "an omission or misstatement is material under Rule 10b-5 if it is substantially likely that a reasonable investor would have viewed the omitted or misstated fact as significantly altering the 'total mix' of information made available." *Id.,* quoting *Basic Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988). Plaintiffs' allegations essentially fall into four different categories of misleading statements.[20] First, plaintiffs claim that the prospectuses misled investors into believing that the Funds' securities were a "safe" or "conservative" investment. Although a review of the prospectuses[21] reveals no express assurances of conservatism, the prospectuses do contain various statements that plaintiffs contend imply a low-risk venture. For example, each of the prospectuses describes the

---

**18.** Plaintiffs' allegations that the underwriters "participated in preparing materially misleading prospectuses," and that the advisors, appraisers and guarantors "drafted and approved, and/or controlled persons who drafted and approved, the materially misleading communications" are pled on information and belief and are unsupported by allegations of fact. Complaint ¶¶ 82, 102, 123, 147, 168, 189, 206, 224. Even if these allegations were pled with particularity as required by Rule 9(b), the underwriters, guarantors, appraisers and advisors could only be charged with aiding and abetting liability.

**19.** Liability for the defendants alleged to be "controlling persons" of the Funds is addressed later in the discussion.

**20.** The court need not address plaintiffs' allegations that the Funds' annual shareholder reports and Forms 10-K and 10-Q failed to reflect adequate loan loss reserves. These allegations refer to documents other than the offering prospectuses, and thus are not relevant to our inquiry under § 10(b).

**21.** The court may properly review the offering prospectuses on this motion to dismiss. On September 19, 1990, this court denied plaintiffs' motion to reconsider its order striking certain exhibits from plaintiffs' response to the motion to dismiss. In so holding, the court stated that it would also disregard any matters raised in defendants' motion to dismiss that go beyond attacking the sufficiency of the allegations contained in the complaint. The prospectuses proffered by defendants do not address matters outside the pleadings. Indeed, plaintiffs concede that they should have attached the prospectuses to their complaint. Response at 7. Thus, the prospectuses may be considered on this motion. *See* 5 C. Wright & A. Miller, *Federal Practice and Procedure,* § 1327 at 762–63 (1969) ("when plaintiff fails to introduce a pertinent document as part of his pleading, defendant may introduce the exhibit as part of his motion attacking the pleading").

Fund's primary objectives as preserving the Fund's capital and providing quarterly distributions to stockholders. Complaint ¶¶ 66, 93, 110, 132, 155, 177, 197, 212. In addition, the prospectuses assure investors that various entities will guarantee the Funds' investments and cash flow. Complaint ¶¶ 66, 93, 197, 212.

 Defendants do not debate the notion that mischaracterizations of risk may constitute misrepresentations of material fact. *Bastian v. Petren Resources Corp.,* 892 F.2d 680, 685–86 (7th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 2590, 110 L.Ed.2d 270 (1990). *Cf. Fisher v. Samuels,* 691 F.Supp. 63, 69 (N.D.Ill.1988). Defendants argue that even if plaintiffs could draw an inference of "safety" from snippets of the prospectuses, any such inference is thoroughly dispelled by the prospectuses' extensive disclosures concerning inherent risks. Defendants ask this court to determine, on a motion to dismiss, that the prospectuses adequately disclosed the risks as a matter of law.

In *Acme Propane, Inc. v. Tenexco, Inc.,* 844 F.2d 1317 (7th Cir.1988), the Seventh Circuit affirmed the dismissal of certain securities fraud claims because the defendants had adequately disclosed the nature of the investment in a document provided to the plaintiffs before they made their investment. In *Acme Propane,* the plaintiffs claimed the defendants made misleading oral statements to them regarding the productivity of certain oil wells. However, accurate productivity information was disclosed in a written "Reserve Estimate" given to plaintiffs prior to their investment. The district court determined that some of defendants' deceitful oral statements were not material to the investment decision because the plaintiffs were told the truth before investing. The Seventh Circuit upheld the district court's Rule 12(b)(6) dismissal of some of the securities fraud claims, based on defendants' written disclo-

sure. The Seventh Circuit noted, however, that "the need to deter deceit, both oral and written, ... [requires] that the written words be true, clear, and complete, in order to be dispositive." [22] *Id.* at 1325.

The court finds the *Acme Propane* reasoning applies to the present case. In the prospectuses, defendants adequately disclaimed any promises that the Funds' securities were a safe or conservative investment. Each Fund's prospectus begins with a preliminary disclosure of the nature of the risks involved:

THIS OFFERING INVOLVES CERTAIN RISKS AND CONFLICTS OF INTEREST, including conflicts of interest inherent in each and every transaction into which the Fund intends to enter with Affiliated Borrowers; economic risks relating to the ability of Borrowers to repay the [l]oans; risks associated with mortgage investments in real estate; risks of ownership of real property; the risk that VMS Financial Guarantee Limited Partnership (the "Guarantor") may not be able to honor its guarantees to the Fund; the inability of prospective investors to evaluate specific investments; the possible inability of the Fund promptly to invest and reinvest its assets in [l]oans or [r]eal [p]roperty on favorable terms; the possible concentration in the type and number of investments; the payment of certain fees to the Advisor and its Affiliates; ... federal income tax risks; and various other risks. See "Conflicts of Interest," "Risk Factors" and "Income Tax Consequences."

MIF prospectus at 2. *See also* prospectuses of: the Income Trust at 1; MILP I at 1; MILP II at 1; MILP III at 1; the Hotel Fund at 2; the Land Trust at 2; Land Fund II at 3. In addition, each prospectus contains a more detailed risk disclosure about inherent conflicts of interest, and the possibility that the guarantors would be unable to honor their guarantees.[23] As to the prospectuses' declared objectives to "pre-

---

**22.** Following this standard, the *Acme Propane* court reversed some of the district court's holdings because the reserve estimate contained several ambiguous statements.

**23.** See the prospectuses of: MIF at 15, 25; the Income Trust at 9, 12–15; MILP I at 12–15, 40; MILP II at 12–15, 46; MILP II at 17–20, 60; the Hotel Fund at 13–15; the Land Trust at 13–16; 21; Land Fund II at 15–19; 23.

serve and protect the [Fund's] capital," and to "provide for quarterly cash distributions," each and every prospectus states that "[t]here can be no assurance that [the Fund's] objectives will be attained." [24] Furthermore, regarding the assurance at page 3 of the Income Trust's prospectus that the Fund would "utilize the services of unaffiliated MAI real estate appraisers in determining whether to make short term loans," the prospectus stated at page 9 that

> appraisals and/or preliminary valuation letters are merely opinions by individuals as to the value of real property.... There will be no assurance that [property securing a loan] could be resold or refinanced at its appraised value.

The foregoing disclosures are clear and unambiguous. Thus, none of the paragraphs to which plaintiffs refer supports a reasonable inference that the prospectuses misrepresented the Funds as safe or conservative investments. Moreover, nowhere in the prospectuses can one find an express assurance that an investment in a Fund would be "safe" or "conservative." Hence, plaintiffs have failed to properly allege that the prospectuses contained affirmative misrepresentations of material fact concerning the Funds' risks.

Second, plaintiffs allege that the prospectuses failed to apprise potential investors of the extent to which the Funds depended on VMS Realty Partners. According to plaintiffs, VMS Realty Partners routinely advanced money to the Funds' borrowers so that the borrowers would be able to make their loan payments to the Funds. Plaintiffs argue that this somewhat incestuous financial arrangement should have been disclosed to potential investors in the prospectuses. In the first place, the court notes that the prospectus for each Fund was issued and the securities were sold before each Fund made any loans to borrowers. Nevertheless, plaintiffs advance the palpable theory that after the first Fund had been operating for some time, defendants should have been on notice that

subsequent Funds would make loans to borrowers who relied on VMS Realty Partners for financial assistance. Thus, argue plaintiffs, each offering prospectus should have reflected anticipation that VMS Realty Partners would provide subsidies to the Fund's borrowers. For several reasons, the court does not agree.

■■■■ Liability under § 10(b) and Rule 10b–5 does not attach to omissions absent a duty to disclose. *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 944 (7th Cir.1989). A duty to disclose arises in two ways. Incomplete disclosures or half-truths give rise to a duty to disclose whatever additional information is necessary to rectify misleading statements. *Id.* In addition, a duty to disclose may be triggered by a fiduciary-type relationship, even absent any misleading statements. *Id.* It is well established that a seller of securities owes no fiduciary duty to a prospective purchaser. *Ambrosino*, 635 F.Supp. at 973. Thus, any duty to disclose VMS Realty Partners' alleged practice of subsidizing the Funds' borrowers must stem from incomplete disclosures in the prospectuses that would render the prospectuses misleading without further disclosure.

■■■ The prospectuses advise investors that the Funds' success depends largely on the ability of borrowers to meet their loan obligations. Plaintiffs argue that this disclosure is misleading without further informing investors that VMS Realty Partners would regularly advance money to the borrowers. However, defendants correctly assert that VMS Realty Partners' subsidies did not in any way make the Funds' securities more risky. To the contrary, the policy of subsidizing borrowers provided less risk to the Funds, as they were more likely to collect payment from borrowers. Thus, the failure to disclose this practice could not have caused investors to underestimate the level of risk involved. Under the *Rowe* standard, the omissions were not materially

---

**24.** *See* the prospectuses of: MIF at 1; MILP I at 1; MILP II at 2; MILP III at 1; the Hotel Fund at 2; the Land Trust at 2; Land Fund II at 2. *Also see* the Income Trust's prospectus at 27

"[t]he ability of the Trust to attain [its] objectives is subject to circumstances which are beyond the control of the Trust, the Advisor, and their Affiliates ..."

misleading and defendants had no duty to disclose them.

Third, plaintiffs charge defendants with failing to disclose the Funds' practice of making loans secured by overleveraged properties. The Funds' prospectuses state that loans to affiliated borrowers would be on terms approximating those of arm's-length transactions, or would be as favorable to the Fund as loans to an unaffiliated borrower in similar circumstances. Complaint ¶¶ 66, 110, 132, 155, 177, 212. Plaintiffs allege that in violation of these promises, the Funds routinely made loans secured by overcollateralized properties. Plaintiffs contend that the annual reports and other documents issued subsequent to the prospectus were materially misleading because they did not disclose the overleveraged loans.

In the foregoing discussion on the transaction requirement, the court explained that plaintiffs cannot base their securities fraud claims on these subsequent documents. In any event, plaintiffs' allegations of overleveraging fail to meet Rule 9(b)'s requirement of particularity. Except for the Income Trust (¶ 92) and MILP I (¶ 109), plaintiffs simply recite the allegation that the prospectuses for the Funds were materially misleading because

> VMS Realty Partners and its affiliates, including the ... Funds, repeatedly engaged in a practice of making loans on properties where the aggregate amount of financing greatly exceeded the value of the property.

Complaint ¶ 130. *See also* ¶¶ 65, 154, 175, 196, 212. Plaintiffs make these conclusory allegations on information and belief, yet fail to support them with allegations of fact, as required by Rule 9(b). *Duane v. Altenburg,* 297 F.2d 515, 518 (7th Cir.1962); *Bruss Co. v. Allnet Communication Services, Inc.,* 606 F.Supp. 401, 405 (N.D.Ill. 1985). Therefore, as to all of the Funds except MILP I and the Income Trust, plaintiffs have failed to allege overleveraging with specificity under Rule 9(b).

Despite compliance with the particularity requirement of Rule 9(b), the allegations of overleveraged loans for the Income Trust and MILP I do not support plaintiffs' claims that the prospectuses misrepresented material facts. The prospectuses merely promise that the Funds' loans will approximate arm's-length transactions or contain favorable terms. As Judge Shadur explained, "expressions of opinion and promises or predictions of future fact ordinarily cannot ground fraud charges." *SFM Corp. v. Sundstrand Corp.,* 99 F.R.D. 101, 105 (N.D.Ill.1983).

Finally, plaintiffs maintain that the prospectuses should have disclosed that the Funds engaged in loan churning, and that VMS Realty Partners thereby engaged in a Ponzi, or pyramiding, scheme to keep creating new Funds in order to bail out failing borrowers of existing Funds.[25] Defendants are correct in observing that allegations of loan churning are properly viewed as charges of breach of fiduciary duty and mismanagement. It is well established that investors cannot recover under § 10(b) and Rule 10b–5 for breach of fiduciary duty. *Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977); *DiLeo,* 901 F.2d at 627. Nor can plaintiffs make out a securities fraud claim by alleging that defendants failed to disclose their intent to breach fiduciary duties:

> courts have consistently held that since a shareholder cannot recover under 10b–5 for a breach of fiduciary duty, neither can he "bootstrap" such a claim into a federal securities action by alleging that the disclosure philosophy of the statute obligates defendants to reveal either the culpability of their activities, or their impure motives for entering the allegedly improper transaction.

---

**25.** The phrase "Ponzi scheme" finds its origin in a man with a remarkable criminal financial career, Charles Ponzi. *See Cunningham v. Brown,* 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924) (Cunningham was Ponzi's trustee in bankruptcy). Since the *Brown* decision, the term "Ponzi scheme" has been used to describe a fraudulent arrangement that uses later-acquired funds to pay off previous investors. *In re Bullion Reserve of North America,* 836 F.2d 1214, 1219 n. 8 (9th Cir.), *cert. denied,* 486 U.S. 1056, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988).

*Panter v. Marshall Field & Co.*, 646 F.2d 271, 288 (7th Cir.), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981).

In sum, plaintiffs' allegations do not amount to misrepresentations of material fact.

#### c. Scienter

■■■■■ In order to satisfy the scienter requirement, plaintiffs must adequately allege that defendants misrepresented the nature of the risks with the "intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976); *Schlifke,* 866 F.2d at 946. Allegations of recklessness are sufficient to meet this standard. *Id.; Rankow v. First Chicago Corp.*, 870 F.2d 356, 367 (7th Cir.1989).

The court has already determined that the Funds' advisors, appraisers, guarantors and underwriters cannot properly be charged with primary liability under § 10(b) and Rule 10b–5. The scienter element for these defendants is addressed in the discussion of aiding and abetting liability. As to the remaining defendants—the Funds and their officers, directors and trustees, and VMS Realty Partners and its affiliates—the complaint adequately alleges scienter.[26] For each count charging violations of § 10(b) and Rule 10b–5, plaintiffs recite the same allegation as to state of mind:

> Those defendants on this count who are the principals in VMS Realty Partners, the companies through which VMS Realty Partners was controlled by its principals, and VMS Realty Partners itself, together with ... members of senior management of VMS Realty Partners and its affiliates or who were involved in the management of the Fund *knew or recklessly disregarded* the materially misleading nature of the documents issued by the Fund during the Class Period.... Similarly, the directors of the Fund who are not members of management *recklessly or intentionally ac-*

quiesced in the gross overleveraging [and other breaches of fiduciary duty].... Th[e]se defendants drafted and approved, and/or controlled persons who drafted and approved, the materially misleading communications by or on behalf of the Fund....

Complaint ¶¶ 80–81, 100–101, 121–22, 145–46, 166–67, 187–88, 204–05, 222–23 (emphasis added). Rule 9(b) allows state of mind to be pleaded generally, as long as the circumstances of the deception are stated with particularity. *DiLeo,* 901 F.2d at 627. Plaintiffs have alleged the roles of these defendants and the extent to which they were involved with the operation and management of the Funds. They also allege that VMS Realty Partners, its principals and its affiliates, earned millions of dollars in fees from the Funds. These allegations are sufficient, at this stage of the litigation, to provide a basis for a reasonable inference that the defendants at least acted recklessly. In *Rankow,* the Seventh Circuit observed that

> to determine whether the conduct involved in this case is reckless or negligent requires a more detailed inquiry into the facts, one which is not appropriate—or, indeed, possible—on the complaint alone.

870 F.2d at 367. The court adopts the reasoning set forth in *Rankow.* At this preliminary stage, plaintiffs have alleged scienter with adequate specificity.

#### d. Causation

■■■ Plaintiffs must allege both "transaction causation" and "loss causation" in order to make out a § 10(b) and Rule 10b–5 claim. *LHLC Corp. v. Cluett, Peabody & Co., Inc.*, 842 F.2d 928, 931 (7th Cir.), *cert. denied,* 488 U.S. 926, 109 S.Ct. 311, 102 L.Ed.2d 329 (1988). To establish "transaction causation," plaintiffs must allege that they would not have purchased the securities had the defendants made truthful

---

**26.** The Xerox defendants present an exception to the court's finding of sufficient allegations of scienter. XCC obtained its interest in VMS Realty Partners in February 1987. Prior to this date, XCC, Xerox Corporation, Xerox Credit Corporation, Xerox Financial Services and Melvin Howard remained uninvolved with the Funds and therefore could not have possessed the intent to deceive the Funds' investors.

statements at the time required. *Id.* "Loss causation" presents a more difficult burden for plaintiffs. They must allege that they would not have suffered a loss on their investment if the facts were as they believed them to be at the time they purchased the securities. *Id.* Defendants do not question the adequacy of plaintiffs' allegations regarding transaction causation. However, defendants argue that, in light of the Seventh Circuit's recent opinion in *Bastian v. Petren Resources Corp.*, 892 F.2d 680 (7th Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 2590, 110 L.Ed.2d 270 (1990), plaintiffs fail to adequately allege loss causation.

■ In *Bastian*, the plaintiffs invested in oil and gas limited partnerships promoted by the defendants in 1981. By 1984, the limited partnerships were worthless. The plaintiffs in *Bastian* claimed that they were induced to invest by the offering memoranda, which allegedly misrepresented the defendants' competence and integrity. The *Bastian* court rejected the plaintiffs' argument that they need only allege that misrepresentations caused them to invest in the limited partnerships, and that the limited partnerships subsequently became worthless. The court found the plaintiffs' allegations insufficient because "[t]hey have alleged the cause of their entering into the transaction in which they lost money but not the cause of the transaction's turning out to be a losing one." *Id.* at 684. The court noted that the steady decline of oil prices after 1981 could easily have caused the plaintiffs' loss, regardless of the defendants' alleged misrepresentations. *Id.*

In the present case, plaintiffs allege that the Funds were mismanaged and operated for the benefit of VMS Realty Partners and its affiliates. Unlike the plaintiffs in *Bastian*, they do not say that "they have no idea why their investment was wiped out and it does not matter." *Id.* at 683. Therefore, plaintiffs have adequately alleged loss causation as interpreted in *Bastian*.

## 2. *Controlling Person Liability*

■ A sundry of defendants are labelled "controlling persons" of the Funds and are charged with liability for misrepresentations under § 20(a) of the 1934 Securities Exchange Act. Section 20(a) provides, in relevant part:

> Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t. The Seventh Circuit has yet to adopt a firm standard for determining when "controlling person" liability may be imposed. However, the Seventh Circuit has endorsed a two-prong test as the minimum threshold requirement for establishing controlling person liability. *Schlifke,* 866 F.2d at 949. Under this test, plaintiffs must establish (1) that the "controlling person" actually participated in the operations of the controlled person or entity, and (2) that the "controlling person" actually possessed the power to control the specific transaction or activity upon which the primary violation is premised. *Id.* Under this threshold test, it is clear that the underwriters, guarantors, advisors and appraisers cannot be liable under § 10(b) as controlling persons. Plaintiffs have not alleged facts to indicate that any of these defendants had the authority to control the operation of the Funds. *See Schlifke,* where a bank that financed a limited partnership's oil and gas exploration program and whose loan documents were included in the partnership prospectus did not qualify as "controlling person."

In addition, plaintiffs improperly charge XCC, Xerox Credit Corporation, Xerox Financial Services, and Melvin Howard with controlling person liability for securities fraud regarding all the Funds. XCC did not acquire its interest in VMS Realty Partners until February 1987. Therefore, XCC and the other Xerox defendants could not

possibly have possessed authority to control any of the Funds prior to February 1987. Thus, the Xerox defendants cannot be liable as controlling persons with respect to those prospectuses that circulated before February 1987: the Income Trust, MILP I, MILP II, the Hotel Fund and the Land Trust.

Regarding the Funds, VMS Realty Partners, and the directors, officers and trustees of these entities, plaintiffs have sufficiently alleged controlling person liability under the threshold test. However, defendants urge this court to adopt the Ninth Circuit's more stringent test requiring that these defendants be "culpable participants" in the alleged illegal activity. *Orloff v. Allman*, 819 F.2d 904, 906 (9th Cir.1987). Although the Seventh Circuit in *Schlifke* reserved ruling on this issue, defendants point out that judges of this district have required "culpable participation" in the alleged wrongdoing. *Beck v. Cantor, Fitzgerald & Co., Inc.*, 621 F.Supp. 1547, 1564 n. 20 (N.D.Ill.1985) (Rovner, J.) ("mere titles are not adequate indicators of authority") quoting *Hudson v. Capital Management International, Inc.*, [1982–83 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 99,222 at 95, 905, 1982 WL 1385 (N.D.Cal. Aug. 24, 1982); *Kennedy v. Nicastro*, 503 F.Supp. 1116, 1121 (N.D.Ill.1980) (Shadur J.).[27] The requirement of "culpable conduct" seems in keeping with the Supreme Court's view that people may be liable under § 10(b) only if they act with intent to deceive. *Ernst & Ernst, supra; Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490, 495 (7th Cir.1986). This more stringent requirement also ensures that secondary liability "does not sweep up all people who can be characterized as participants in or contributors to the success of the firm that issues the securities." *Barker*, 797 F.2d at 495. For these reasons, the court requires plaintiffs to allege facts indicating culpable conduct on the part of those defendants charged with controlling person liability. Plaintiffs may amend their complaint to conform with the three requirements of controlling person liability discussed here.

### 3. *Aiding and Abetting Liability*

■ The Seventh Circuit recognizes a cause of action for aiding and abetting violations of § 10(b) and Rule 10b–5. *Robin v. Arthur Young & Co.*, 915 F.2d 1120 (7th Cir.1990); *DiLeo*, 901 F.2d at 628. Recently, however, the Seventh Circuit has questioned the propriety of imposing liability on aiders and abettors. *Arthur Young*, at 1123; *DiLeo*, 901 F.2d at 628. In light of this skepticism, the Seventh Circuit has imposed stringent standards for aiding and abetting liability. To hold someone liable for aiding and abetting, the Seventh Circuit requires *at a minimum* that the alleged aider and abettor

(1) commit one of the manipulative or deceptive acts prohibited under section 10(b) and rule 10b–5, (2) with the same degree of scienter that primary liability requires.

*Arthur Young*, at 1123; *Renovitch v. Kaufman*, 905 F.2d 1040, 1045 (7th Cir. 1990). The alleged aider, abettor or conspirator need not have offered or sold the security in order to be held liable. However, mere knowledge of a material omission is not enough to violate Rule 10b–5 absent a duty to disclose. *Barker*, 797 F.2d at 495.

The foregoing analysis compels a conclusion that plaintiffs have failed to sufficiently plead material misrepresentations essential to a violation of § 10(b) and Rule 10b–5. This deficiency precludes recovery for aiding and abetting liability. Thus, the complaint fails to meet the first requirement for aiding and abetting liability.

---

**27.** Plaintiffs claim that Judge Williams' opinion in *Edison Credit Union v. Bevill, Bresler & Schulman Inc.*, No. 79 C 4049 slip op. at 10, 1987 WL 15408, 1987 U.S.Dist. LEXIS 7096 (N.D.Ill. Aug. 3, 1987), embraced the less stringent test for controlling person liability. Response at 32. Contrary to plaintiffs' assertion, the court in *Edison* held that

[i]t seems consistent with [Congress'] intent to limit liability to "culpable participants" to require the plaintiff to prove facts, *beyond mere status*, which indicate that the alleged controlling person had the ability and responsibility to control the particular transaction in question.

*Id.* at 10 (emphasis added).

The court need not engage in an elaborate discussion of the numerous inadequacies inherent in plaintiffs' attempt to plead scienter on the part of many of the aiders and abettors. The court need only note that plaintiffs cannot evade the requirements of Rule 9(b) by pleading conclusory allegations of knowledge or reckless disregard of misleading statements. As the Seventh Circuit explained in *DiLeo*, boilerplate allegations of intent and knowledge are insufficient. *DiLeo*, 901 F.2d at 629. There must be some basis in the complaint for believing that plaintiffs could prove scienter. *Id.; Arthur Young*, at 1127. Plaintiffs have failed to do this regarding the allegations directed at the advisors, appraisers, guarantors and underwriters who are not directly affiliated with VMS Realty Partners or the Funds. Plaintiffs fail to allege that these independent defendants had anything to gain from any fraud by the primary violators. Allegations that these defendants accepted large fees for their services will not suffice to support an inference of scienter. *Arthur Young*, at 1127; *DiLeo*, 901 F.2d at 629. The Seventh Circuit has twice acknowledged that the potential injury to a defendant's reputation for integrity far outweighs any possible gain from retaining a client. *Arthur Young*, at 1127; *DiLeo*, 901 F.2d at 629 ("An accountant's greatest asset is its reputation for honesty, followed closely by its reputation for careful work. Fees ... could not approach the losses [the accounting firm] would suffer from a perception that it would muffle a client's fraud.").

In sum, plaintiffs fail to properly allege aiding and abetting liability. In order to state a claim for aiding and abetting liability, plaintiffs must first allege material misrepresentations or omissions that defendants had a duty to disclose. Second, plaintiffs must plead scienter in conformance with the principles set forth above.

### B. The 1933 Securities Act Claims

Plaintiffs charge various defendants with violating Sections 11, 12(2) and 15 of the 1933 Securities Act. Defendants move to dismiss all of these claims under Rule 12(b)(6).

### 1. *Section 11*

Counts ten and eleven assert liability under § 11 and are directed at the registration statements and accompanying prospectuses of MIF and Land Fund II, respectively. Section eleven imposes liability if

> ... any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading....

15 U.S.C. § 77k. Pursuant to § 11, purchasers of securities may sue the issuer, its directors or partners, underwriters, and accountants or appraisers who are named as having prepared or certified the registration statement. *Id; Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 n. 13, 103 S.Ct. 683, 687 n. 13, 74 L.Ed.2d 548 (1983). Plaintiffs need not allege scienter to make out a § 11 claim. *Id.* at 382, 103 S.Ct. at 687; *Wielgos v. Commonwealth Edison Co.*, 688 F.Supp. 331, 335 (N.D.Ill.1988).

The analysis of plaintiffs' allegations concerning misleading statements and omissions in the prospectuses under the 1934 Securities Exchange Act applies equally here. For the reasons stated in that portion of this opinion, plaintiffs have failed to allege actionable misrepresentations or omissions of material fact under § 11.

### 2. *Section 12(2)*

Section 12(2) imposes liability on "any person who"

> offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading....

15 U.S.C. § 77*l*(2). Plaintiffs' claims under § 12(2) are insufficient for the same reason described in the immediately preceding section on liability under § 11.

### 3. *Section 15*

■ Defendants are correct in noting that there is no cause of action for aiding and abetting violations of the 1933 Securities Act. *Schlifke*, 866 F.2d at 942. However, plaintiffs have not charged defendants with aiding and abetting liability under § 11 and 12(2). Plaintiffs charge the various defendants in counts ten through fourteen with either primary liability or "controlling person" liability pursuant to § 15. Under § 15,

> [e]very person who, by or through stock ownership, agency, or otherwise, ... controls any person liable under sections 77k [§ 11] or 77l [§ 12] of this title, shall also be liable jointly and severally with and to the same extent as such controlled person ... unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77*o*. Notwithstanding the fact that there can be no controlling person liability without a primary violation, other defects in the complaint preclude charging several of the named defendants with controlling person liability. The court adopts the same analysis for controlling liability under both the 1933 and 1934 Securities Acts.[28] Thus, the deficiencies pointed out in the analysis of controlling person liability under § 20(a) of the 1934 Act render plaintiffs' claims under § 15 of the 1933 Act flawed in the same respect. Should plaintiffs file an amended complaint, it must allege facts to support controlling person liability in accordance with the three requirements set forth in this opinion's dis-

cussion of controlling person liability under § 20(a).

### C. RICO Claims

In count forty, plaintiffs attempt to heap RICO violations on top of their already bulging arsenal of charges against defendants. Count forty charges all defendants with violating RICO, 18 U.S.C. § 1962(a), (b), and (c).[29] This count must be dismissed on Rule 9(b) grounds and for failure to state a claim under Rule 12(b)(6).

#### 1. *Rule 9(b)*

■ The requirement that fraud must be alleged with particularity applies to fraud claims that serve as predicate acts for a RICO claim. *Huang v. Shiu*, 124 F.R.D. 175, 177 (N.D.Ill.1988), citing *Ray v. Karris*, 780 F.2d 636, 644–45 (7th Cir.1985). Plaintiffs base their RICO claims on securities fraud, mail fraud, and wire fraud violations. The Rule 9(b) deficiencies concerning the securities fraud claims are discussed previously in this opinion. Because the securities fraud claims are dismissed on several grounds, the court limits its inquiry to the mail and wire fraud violations. The law of this district is well settled; Rule 9(b) requires plaintiffs to allege *"who* (i.e., which defendant) caused *what* to be mailed *when,* and *how* that mailing furthered the fraudulent scheme." *Hinsdale Women's Clinic, S.C. v. Women's Health Care,* 690 F.Supp. 658, 662 (N.D.Ill.1988), quoting *Ghouth v. Conticommodity Services, Inc.,* 642 F.Supp. 1325, 1331–32 (N.D.Ill.1986) (emphasis in original). Plaintiffs' allegations of mail and wire fraud consist of the following:

**28.** *See, e.g., Beck,* 621 F.Supp. at 1564 (Rovner, J.); *Kennedy v. Nicastro,* 503 F.Supp. at 1121 (Shadur, J.); applying the same standards of controlling person liability for claims under § 15 of the 1933 Act and § 20(a) of the 1934 Act.

**29.** The relevant portions of the RICO statute, 18 U.S.C. § 1962 provide:

> (a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any

> enterprise which is engaged in ... interstate or foreign commerce.
> (b) It shall be unlawful for any person through a pattern of racketeering activity ... to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in ... interstate or foreign commerce.
> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in ... interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity....

Its [sic] acts of mail fraud include its use of the United States mails for the purpose of disseminating information relating to the Funds, in order to induce persons to purchase the Funds' securities. Its acts of wire fraud include its use of the instrumentalities of telephonic communication in connection with the sale of the Funds' securities.

Complaint ¶ 358. The court notes that "it is not the function of this [c]ourt to educate plaintiff[s'] attorneys as to how to plead fraud with particularity." *Huang,* 124 F.R.D. at 177. Suffice it to say that the complaint's vague allegations of the use of the mails and telephones do not come close to satisfying Rule 9(b).

### 2. *Rule 12(b)(6)*

■■■ Even if plaintiffs had alleged fraud with particularity, plaintiffs' RICO claims under § 1962(b) and (c) must be dismissed because plaintiffs have not pleaded the essential elements. In addition, the § 1962(a) claim must be dismissed as to many of the defendants. Plaintiffs allege that all of the named defendants, together with other entities affiliated with VMS Realty Partners, acted in association with one another and constituted an "enterprise" (the "VMS enterprise") as that term is defined under 18 U.S.C. § 1961(4).[30] Complaint ¶ 357. The language of § 1962(c) indicates it was intended to govern only those situations in which the enterprise was the passive, innocent victim of racketeering. *Liquid Air Corp. v. Rogers,* 834 F.2d 1297, 1306 (7th Cir.1987), *cert. denied,* —— U.S. ——, 109 S.Ct. 3241, 106 L.Ed.2d 588 (1989). Thus, in order to make out a RICO violation under § 1962(c), the "person" who commits the predicate acts of racketeering must be separate from the "enterprise." *Liquid Air,* 834 F.2d at 1306; *Haroco, Inc. v. American Nat. Bank & Trust Co.,* 747 F.2d 384 (7th Cir.1984), *cert. granted,* 469 U.S. 1157, 105 S.Ct. 902, 83 L.Ed.2d 917 *aff'd,* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985). Because plaintiffs have not alleged that defendants are dis-

tinct from the enterprise, plaintiffs' RICO claim under § 1962(c) must be dismissed.

Plaintiffs' claim under § 1962(a) does not suffer from the same deficiency as the § 1962(c) claim. In *Liquid Air,* the Seventh Circuit determined that, unlike § 1962(c),

> there [is] nothing in the language of subsection (a) that seem[s] to require that the liable "person" be a distinct entity from the "enterprise." In other words, subsection (a), by its express language, encompassed circumstances under which the enterprise itself was guilty of wrongdoing.

*Liquid Air,* 834 F.2d at 1306. Assuming plaintiffs could allege the requisite racketeering activity, which at this point they have failed to do, plaintiffs would make out a claim for violation of § 1962(a) only if they established that defendants used income derived from a pattern of racketeering activity to operate or maintain the VMS enterprise. At this juncture, it is worthwhile to point out that plaintiffs have not alleged facts that would support a reasonable inference that *all* defendants stood in a position to operate or maintain the VMS enterprise, much less that these defendants actually exercised such authority.

■■■ Finally, plaintiffs' allegations regarding violations of § 1962(b) are misplaced and border on the frivolous. Congress enacted § 1962(b) with the purpose of prohibiting the takeover of legitimate businesses through racketeering, typically extortion or loansharking. D. Smith and T. Reed, *Civil Rico,* ¶ 5.01 (1990). In order to establish liability under § 1962(b), plaintiffs must allege that defendants' racketeering activity caused—or at least facilitated—defendants' acquisition or maintenance of an interest in or control of the VMS enterprise. *Capalbo v. PaineWebber, Inc.,* 694 F.Supp. 1315, 1319–1320 (N.D.Ill.1988). Plaintiffs' allegations under § 1962 are limited to the following statement:

> [T]hrough the aforesaid pattern of racketeering activity, defendants have ac-

---

**30.** Under 18 U.S.C. § 1961(4), an enterprise includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.

quired and maintained their interest in and control of the VMS Enterprise and have conducted and/or participated in the conduct of the affairs of the VMS Enterprise.

Complaint ¶ 360. Aside from the Rule 9(b) problems inherent in this conclusory statement, this allegation does not assert that defendants engaged in the alleged pattern of racketeering activity *in order to* acquire or maintain control of the VMS empire. Indeed, the complaint is devoid of any factual allegations which could support such an inference. Plaintiffs' § 1962(b) claim is dismissed.[31]

### D. Common Law Claims

Because all of plaintiffs' federal claims must be dismissed on several grounds, this court declines to reach the issues posed by the pendent state law claims in counts fifteen through thirty-nine. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). *See also Beck*, 621 F.Supp. at 1564 (in securities fraud class action where federal securities fraud claims were dismissed, court declined to consider state law claims until the filing of the second amended complaint).

### IV. Defendants' Motion to Strike Plaintiffs' Request For Punitive Damages

Plaintiffs submit a single prayer for relief covering all forty counts of their complaint. In their prayer for relief, plaintiffs make a general request for punitive damages. Defendants ask this court to strike the claim for punitive damages except as to the common law fraud claims. Plaintiffs make no argument in opposition to this request.

▊▊▊ The federal securities laws do not provide for recovery of punitive damages. *Ambrosino*, 635 F.Supp. at 972. In addition, punitive damages may not be awarded in negligence cases. *Galayda v. Penman*, 80 Ill.App.3d 423, 35 Ill.Dec. 590,

595, 399 N.E.2d 656, 661 (1980). As to the RICO claims, the treble damages provisions define the extent of possible recovery. *Southwest Marine, Inc. v. Triple A Machine Shop, Inc.*, 720 F.Supp. 805, 810 (N.D.Cal.1989) ("civil remedy provisions of RICO ... provide treble damages which are themselves punitive in character"). Hence, defendants' motion to strike plaintiffs' request for punitive damages is granted except as to the common law fraud claims.

### CONCLUSION

For the foregoing reasons, the court dismisses the consolidated complaint. Because the statute of limitations presents an absolute bar to counts four and six, these counts are dismissed with prejudice. Count nine is also dismissed with prejudice. The remaining counts are dismissed without prejudice. In order to insure that any future amended complaint does not reiterate the extensive problems identified in this opinion, the court summarizes the deficiencies.

1. Plaintiffs must allege their precise dates of purchase. Should plaintiffs fail to do so, the court will dismiss with prejudice the claims of all plaintiffs who have not specified when they purchased their securities. However, if plaintiffs amend their complaint to allege purchase dates after the initial public offerings, the court will consider whether documents issued by the Funds after the initial public offerings contain misrepresentations or omissions of material fact.

2. In order to comply with the statute of limitations, plaintiffs must plead facts showing (a) that they purchased securities within three years of January 11, 1990, and (b) that equitable tolling forestalls the one-year period of limitations for all plaintiffs who purchased their securities more than one year before November 14, 1989.

---

**31.** In light of the overwhelming deficiencies in the RICO claims, the court need not address at this time defendants' concerns that the enterprise is not separate from the alleged pattern of racketeering activity. Contrary to defendants' assertions, there is no requirement of a "RICO injury" separate and distinct from the injuries suffered due to the predicate acts of racketeering themselves. *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 495, 105 S.Ct. 3275, 3284, 87 L.Ed.2d 346 (1985).

3. For each count, plaintiffs must specifically identify the defendants charged. Plaintiffs are directed not to charge defendants with misrepresentations with which they could not possibly have been connected, *i.e.*, the Xerox defendants prior to February 1987.

4. For all federal securities fraud claims, plaintiffs must allege misrepresentations and omissions of material fact. Plaintiffs must also clarify which defendants are charged with primary, aiding and abetting, and controlling person liability.

5. Plaintiffs' allegations of controlling person liability under the 1933 and 1934 Securities Acts must comply with the standards set forth in this opinion.

6. All claims of aiding and abetting liability under the 1934 Act must allege misrepresentations of material fact and scienter.

7. Plaintiffs must correct all substantive and pleading defects in the RICO claims.

## ON MOTION FOR RECONSIDERATION

On October 19, 1990, the court dismissed plaintiffs' consolidated class action complaint. Counts four, six and nine were dismissed with prejudice. Plaintiffs now move for reconsideration, and request leave to replead counts four, six and nine.

Counts four and six assert claims, on behalf of purchasers of MILP II and Hotel Fund securities, for violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder. The court dismissed these claims with prejudice because, based on the allegations of the consolidated complaint, certain plaintiffs had clearly purchased securities of MILP II and the Hotel Fund more than three years before the filing of the first class action naming all of the VMS funds as defendants on January 11, 1990. Upon reconsideration, the court notes that several named plaintiffs representing the Hotel Fund and MILP II subclasses did not allege any purchase dates. As to these plaintiffs, the court could not determine whether the three-year statute of limitations precludes their federal securities fraud claims. The court's October 19, 1990

order granted plaintiffs of other subclasses leave to allege their dates of purchase in order to show compliance with the statute of limitations. The court now grants plaintiffs' motion for leave to plead the purchase dates of those plaintiffs representing the Hotel Fund and MILP II subclasses, for whom the consolidated complaint failed to identify when their securities were purchased. Those plaintiffs are: Walter D. Ford, Sr.; John E. Holcomb; Paul J. Isaac; Mary Maganos; Quaker Valley Meats, Inc. Pension Plan UDT 11/1/83, Norman Fleekop, Trustee; Bertrand Sellier; and Judith Ludwig.

The court will not, however, reconsider the claims of those plaintiffs who clearly purchased their Hotel Fund and MILP II securities more than three years before January 11, 1990. The claims of David Robbins, Atlantic Electric Supply Corp. Pension Plan, John and Ilana Falco (regarding MILP II), and Marie Matson (regarding the Hotel Fund) remain dismissed with prejudice.

As to count nine, the court dismissed that claim because the allegations were impermissibly vague, in violation of Federal Rule of Civil Procedure 9(b). This dismissal should have been without prejudice. Plaintiffs' motion to replead count nine to conform with Rule 9(b) is granted.